Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/18/2019 01:11 AM CDT

In re Application No. OP-0003.
TransCanada Keystone Pipeline, LP, et al., appellees and
cross-appellees, v. Susan and William Dunavan et al.,
appellants, Yankton Sioux Tribe of South Dakota
and Ponca Tribe of Nebraska, appellees and
cross-appellants, and Sierra Club, Nebraska
Chapter, et al., appellees.

___ N.W.2d ___

Filed August 23, 2019.    No. S-17-1331.

1. **Jurisdiction: Appeal and Error.** A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law.

2. **Administrative Law: Statutes: Appeal and Error.** The meaning and interpretation of statutes and regulations are questions of law for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.

3. **Constitutional Law: Due Process.** The determination of whether the procedures afforded to an individual comport with constitutional requirements for procedural due process presents a question of law.

4. **Public Service Commission: Appeal and Error.** Under Neb. Rev. Stat. § 75-136(2) (Reissue 2018), an appellate court reviews an order of the Nebraska Public Service Commission de novo on the record.

5. **Appeal and Error.** In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue.

6. **Administrative Law: Appeal and Error.** Where the evidence is in conflict, the Supreme Court will consider and may give weight to the fact that the agency hearing examiner observed the witnesses and accepted one version of the facts rather than another.

7. **Constitutional Law: Public Service Commission.** The Nebraska Public Service Commission is an independent regulatory body created by the Nebraska Constitution in article IV, § 20.

8. **Public Service Commission.** The determination of what is consistent with the public interest, or public convenience and necessity, is one that is peculiarly for the determination of the Nebraska Public Service Commission.

9. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

10. **Statutes: Legislature: Intent.** Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.

11. **Evidence.** Unless an exception applies, only a preponderance of evidence is required in civil cases.

12. **Trial: Evidence: Proof.** The burden of proof is satisfied by actual proof of the facts, of which proof is necessary, regardless of which party introduces the evidence.

13. **Administrative Law: Pleadings.** The rules of pleading are not applied in administrative proceedings as strictly as they are in court proceedings.

14. **Administrative Law: Due Process: Notice.** Due process requires notice and an opportunity for a full and fair hearing at some stage of the agency proceedings.

15. **Notice: Waiver.** It is generally held that participation in the hearing waives any defect in the notice.

16. **Administrative Law: Appeal and Error.** An appellate court will not consider an issue on appeal that was not presented to or passed upon by the administrative agency.

17. **Interventions: Final Orders: Appeal and Error.** An order denying intervention is a final order for purposes of appeal.

18. **Administrative Law: Statutes.** Agency regulations properly adopted and filed with the Secretary of State of Nebraska have the effect of statutory law.

19. **Rules of Evidence: Hearsay: Statutes.** The Nebraska Evidence Rules provide that hearsay is admissible when authorized by the statutes of the State of Nebraska.

20. **Legislature: Courts: Evidence.** The legislative branch has the right to prescribe the admissibility of certain categories of evidence, but it is solely a judicial function to determine the weight, if any, to be given such evidence.

21. **Evidence: Appeal and Error.** In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.

22. **Interventions: Pleadings.** Intervenors can raise only issues that sustain or oppose the respective contentions of the original parties.
23. **Interventions: Parties.** An intervenor who is not an indispensable party cannot change the position of the original parties or change the nature and form of the action or the issues presented therein.
24. **Interventions.** An intervenor cannot widen the scope of the issues, broaden the scope or function of the proceedings, or raise questions which might be the subject of litigation but which are extraneous to the controlling question to be decided in the case.

Appeal from the Public Service Commission. Affirmed.

David A. Domina and Brian E. Jorde, of Domina Law Group, P.C., L.L.O., for appellants.

Douglas J. Peterson, Attorney General, L. Jay Bartel, David A. Lopez, and Lynn A. Melson for appellee Nebraska Public Power Service Commission.

James G. Powers and Patrick D. Pepper, of McGrath, North, Mullin & Kratz, P.C., L.L.O., for appellees TransCanada Keystone Pipeline, LP, et al.

Jennifer S. Baker and Leonika R. Charging, of Fredericks, Peebles & Morgan, L.L.P., for appellee Yankton Sioux Tribe.

Brad S. Jolly, of Brad S. Jolly & Associates, for appellee Ponca Tribe of Nebraska.

Kenneth C. Winston for appellee Sierra Club, Nebraska Chapter.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Funke, J.

The Nebraska Public Service Commission (PSC) granted the application filed by TransCanada Keystone Pipeline, LP (TransCanada), pursuant to the Major Oil Pipeline Siting Act (MOPSA), Neb. Rev. Stat. §§ 57-1401 to 57-1413 (Reissue 2010 & Cum. Supp. 2018), for approval of a major oil pipeline

route and eminent domain authority. The PSC approved the "Mainline Alternative Route" (MAR), a 36-inch major oil pipeline and related facilities to be constructed through Nebraska, from the South Dakota border in Keya Paha County, Nebraska, to Steele City, Nebraska. The landowners, two Indian tribes, and the Sierra Club, Nebraska Chapter (Sierra Club), all intervened in the proceedings. The landowners appealed, the Indian tribes cross-appealed, and the Sierra Club attempted to appeal from the PSC's decision.

The intervenors raise numerous arguments on appeal. Each of these arguments raises issues of public concern and represents profound, deeply held beliefs. Upon de novo review of the PSC's decision, we find the matters in controversy are resolved based on the determination of four overarching issues: The first, whether the PSC had jurisdiction to consider TransCanada's application; the second, whether TransCanada met its burden of proof; the third, whether the PSC properly considered the MAR; and the fourth, whether the intervenors were afforded due process. We answer each of these questions in the affirmative.

At the outset, we observe that this appeal comes to us in a completely different legal framework than we confronted in *Thompson v. Heineman*.[1] While both cases involve the statutory process for obtaining route approval of an oil pipeline, the issues in this appeal are distinctly different from those in *Thompson* because here, route approval was sought from the PSC using the MOPSA procedure. In this opinion, we describe the procedures enacted by the Legislature to effectuate proceedings under MOPSA. We discuss the record in detail and show that TransCanada carried its burden of proving that the MAR is in the public interest. We then determine that the errors assigned by the intervenors are without merit. Accordingly, we affirm the PSC's determination that approval of the MAR is in the public interest.

---

[1] *Thompson v. Heineman*, 289 Neb. 798, 857 N.W.2d 731 (2015).

## I. BACKGROUND

TransCanada is a limited partnership organized in Delaware with its principal place of business in Houston, Texas. In 2008, TransCanada applied for a presidential permit to construct a pipeline across the Canadian border into the United States. The proposed route would have passed through the Nebraska Sandhills at a time when no legal standards existed in Nebraska to constrain an oil pipeline carrier's right to exercise eminent domain authority.[2] In 2011, Gov. Dave Heineman called a special session of the Legislature to enact siting legislation for pipeline routing.

### 1. Siting Legislation

The Legislature enacted MOPSA, 2011 Neb. Laws, L.B. 1, § 2, 1st Spec. Sess., which gave routing authority to the PSC, an independent regulatory body with duly elected officials.[3] MOPSA applies to a pipeline with an interior diameter larger than 6 inches that is built to transport petroleum products within, through, or across Nebraska.[4] MOPSA requires a major oil pipeline carrier to apply for and obtain routing approval from the PSC before the carrier is authorized to exercise eminent domain power pursuant to § 57-1101.[5]

MOPSA recognized that federal law preempts state regulation of safety issues related to oil pipelines and that Nebraska's laws cannot interfere with the federal government's uniform standards for pipeline safety, operation, and maintenance.[6] Consequently, the Legislature enacted MOPSA to address "choosing the location of the route aside and apart from safety considerations."[7] With MOPSA, the Legislature harnessed

---

[2] See Neb. Rev. Stat. § 57-1101 (Reissue 2010).

[3] See, Neb. Rev. Stat. § 32-509 (Reissue 2016); Neb. Rev. Stat. § 75-101(1) (Reissue 2016).

[4] § 57-1404(2).

[5] See §§ 57-1402(1)(c) and 57-1408(1).

[6] § 57-1402(2).

[7] See *id.*

Nebraska's remaining sovereign powers with respect to oil pipeline construction, granted the PSC authority to conduct proceedings and decide applications, and determined that "[t]he construction of major oil pipelines in Nebraska is in the public interest of Nebraska . . . ."[8]

In the same special session, the Legislature enacted 2011 Neb. Laws, L.B. 4, 1st Spec. Sess., which created a separate procedural avenue for a pipeline carrier to obtain route approval. Independent from the MOPSA process, § 3 of L.B. 4 authorized Nebraska's Department of Environmental Quality (DEQ) to collaborate with any federal agency for the preparation of a supplemental environmental impact statement (SEIS) for oil pipelines within, through, or across Nebraska, in accordance with the review process under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (2012).[9] Once completed, the DEQ was to submit the SEIS to the Governor, who then would have 30 days to indicate his or her approval of a route in writing to the relevant federal agencies.[10] Both L.B. 1 and L.B. 4 were passed with an emergency clause and became effective on the same date, November 23, 2011.

On January 18, 2012, the President of the United States denied TransCanada's permit application. On April 17, 2012, the Legislature passed and the Governor approved 2012 Neb. Laws, L.B. 1161, which amended L.B. 1 and L.B. 4. In its original form, MOPSA did not apply to TransCanada, because the legislation contained an exemption for a pipeline carrier which had a pending application for a presidential permit.[11] L.B. 1161 eliminated that exemption, which led TransCanada to seek to obtain route approval from the PSC under MOPSA.[12]

---

[8] § 57-1403(3).

[9] L.B. 4, § 3(1).

[10] L.B. 4, § 3(4).

[11] L.B. 1, § 5(2).

[12] L.B. 1161, § 4.

L.B. 1161 amended § 3 of L.B. 4 so that the DEQ could either prepare the SEIS through collaboration with federal agencies, as L.B. 4 originally had provided, or could independently evaluate a route submitted by a pipeline carrier "for the stated purpose of being included in a federal agency's or agencies' National Environmental Policy Act review process."[13] This amendment allowed the DEQ to continue to review possible routes for the Keystone XL pipeline project, which the DEQ had ceased reviewing following the President's denial of TransCanada's application for permit.

In conducting an independent evaluation of a proposed route, L.B. 1161 required the DEQ to hold at least one public hearing, provide opportunities for public review and comment, and analyze "the environmental, economic, social, and other impacts associated with the proposed route and route alternatives in Nebraska."[14] The DEQ would then submit its evaluation of the pipeline route to the Governor, and the pipeline carrier could then seek the Governor's approval of the route.[15] L.B. 1161 provided that a pipeline carrier's authorization to exercise eminent domain power expires "[i]f condemnation procedures have not been commenced within two years after the date the Governor's approval is granted or after the date of receipt of an order approving an application under [MOPSA]."[16]

## 2. TransCanada Modifies Route

In 2012, TransCanada modified the original route, which would have passed through the Nebraska Sandhills, based on recommendations provided by the DEQ. On September 5, 2012, TransCanada filed a supplemental environmental report with the DEQ regarding the "reroute." The "reroute" avoided

---

[13] Neb. Rev. Stat. § 57-1503(1)(a)(i) (Cum. Supp. 2018).

[14] Id.

[15] See, § 57-1503(4); § 57-1101 (Cum. Supp. 2018).

[16] § 57-1101 (Cum. Supp. 2018).

the Sandhills and other areas of fragile soils and shallow groundwater identified by the DEQ. On January 3, 2013, the DEQ submitted a final evaluation report to the Governor in accordance with L.B. 1161. On January 22, the Governor approved the "reroute" in a letter to the President and the U.S. Department of State (the Department), asking that the DEQ's evaluation be included in the federal SEIS report. TransCanada filed condemnation actions, which were later dismissed following litigation challenging the constitutionality of L.B. 1161.

More than 2 years passed after the Governor's approval of the route, and TransCanada no longer proceeded on that approval. On January 24, 2017, the President invited TransCanada to resubmit its permit application, which TransCanada accomplished 2 days later. On February 16, TransCanada filed an application with the PSC for approval of a major oil pipeline route. On March 23, the Department granted TransCanada a presidential permit.

### 3. TransCanada's Application to PSC

TransCanada's application to the PSC sought approval of a route designated as the "Preferred Route" (PR), which was "refined to reflect the recommendations made by the [DEQ] and the Governor's approval." The "reroute" submitted to the DEQ in 2012 "was used as the basis for developing the [PR]." The PR is 275.2 miles long and begins at the Nebraska-South Dakota border in Keya Paha County and passes through the Nebraska counties of Keya Paha, Boyd, Holt, Antelope, Boone, Nance, Merrick, Polk, York, Fillmore, and Saline before terminating in Steele City.

The application referred to two alternative routes, the MAR and the "Sandhills Alternative Route" (SAR). TransCanada developed each of the three routes with the goal of utilizing the "existing fixed starting point" at the Nebraska-South Dakota border in Keya Paha County, north of Mills, Nebraska, and the "existing fixed ending point" at the pump station in Steele City, which is the end point of the pipeline system already existing in Nebraska, known as Keystone I. Keystone I



runs north and south through the Nebraska counties of Cedar, Wayne, Stanton, Colfax, Butler, Seward, Saline, and Jefferson. The PR and the MAR run southeastward and were designed to avoid passing through the Sandhills, an ecological region as defined by the DEQ.

The PR would run across the southwest corner of Boyd County and then cross the Keya Paha River; enter Holt County crossing the Niobrara River; cross the Elkhorn River in Antelope County, through Boone County; and cross the Loup River in Nance County. The route would then turn and cross the northeastern corner of Merrick County; cross the Platte River; enter Polk County and continue south through York, Fillmore, and Saline Counties; and end in Jefferson County. The PR would parallel Keystone I for 7.3 miles and would require five pump stations.

The SAR is the route TransCanada initially proposed in 2008. TransCanada's application stated: "Compared to the [SAR], the overall footprint of the [PR] represents less environmental impact by avoiding the Sandhills region and minimizing impacts to areas with characteristics similar to the Sandhills, including shallow groundwater and fragile soils."

The MAR would "follow the [PR] for 110 miles to just south of the Elkhorn River in Antelope County, then head in a southeasterly direction across Madison and Stanton counties for approximately 43 miles to intercept [Keystone I]," and head south and parallel Keystone I for 97.6 miles, crossing Shell Creek and the Platte River in Colfax County. Based on the DEQ's recommendation, TransCanada adjusted the route to divert from Keystone I for 29.8 miles to avoid the "Seward County Wellhead Protection Area." The route then rejoins Keystone I and continues through Saline County to Jefferson County. The MAR would be 5 miles longer than the PR and would require a total of six pump stations.

TransCanada stated in the application that it viewed the PR to be superior to the MAR, because the MAR would require a greater total number of acres; increase the crossing of the ranges of federally recognized threatened and endangered species; increase the crossing of highly erodible soils; increase the crossing of unusually sensitive ecological areas; and increase crossings of perennial streams, railroads, and roads. Despite the MAR's advantages due to its co-location with Keystone I, TransCanada considered the PR to be more beneficial than the MAR, because the PR was shorter and required one fewer pump station.

The application included a reclamation and revegetation plan to fully restore lands disturbed by construction along the route to their preconstruction capabilities. Under the Oil Pipeline Reclamation Act, Neb. Rev. Stat. §§ 76-3301 to 76-3308 (Reissue 2018), TransCanada is responsible for all reclamation costs necessary as a result of constructing and operating the pipeline, except to the extent another party is determined

to be responsible.[17] TransCanada intends to revegetate the pipeline right-of-way as near as practicable to preconstruction conditions to ensure equivalent land capability following construction and the establishment of native plant communities along the pipeline. TransCanada represented that it will abide by § 76-3304(3) and keep its reclamation and maintenance obligations until the pipeline is permanently decommissioned or removed.

The application specified that the pipeline would be 36 inches in diameter for the entire length of the route. Construction would occur in a linear segmented fashion within a 110-foot-wide construction right-of-way, consisting of a 60-foot temporary right-of-way and a 50-foot permanent easement. The width of the construction right-of-way may be decreased or increased to address natural resource or engineering concerns. Moreover, TransCanada stated it will adjust the route "to the extent practicable" to avoid culturally significant sites. In addition to the installation of the pipeline, the PR required the construction and operation of permanent aboveground structures, including 5 pump stations and 19 intermediate mainline valves. The pump stations would be built on purchased land ranging from 7 to 17 acres. Each intermediate mainline valve would be constructed within a fenced site, approximately 50 feet by 50 feet, located within the 50-foot-wide easement.

TransCanada concluded its application by stating that the PR had been thoroughly evaluated by federal and state agencies, was designed to mitigate impacts to natural resources, and ensured minimal impacts to the orderly development and growth of the region. In its prayer for relief, TransCanada requested an order from the PSC that the PR is in the public interest.

### 4. Prehearing Matters

The PSC published notice of TransCanada's application in The Daily Record, a legal newspaper in Omaha, Nebraska, on

---

[17] § 76-3304(1).

February 20, 2017, and set the deadline for formal intervention for March 22. TransCanada filed proof of service of its application on the agencies listed in § 57-1407(3), as well as proof of notice to Antelope, Boone, Boyd, Fillmore, Holt, Jefferson, Keya Paha, Merrick, Nance, Polk, Saline, and York Counties. TransCanada later filed proof that notice of the application was filed in newspapers of general circulation in those counties.

Numerous groups and individuals filed petitions to intervene in the proceedings based on property, economic, natural resource, social, cultural, and territorial interests. On March 30, 2017, TransCanada filed objections to certain petitions for intervention, arguing that the asserted legal rights or interests would not be affected due to the narrow scope of the proceedings. TransCanada argued that MOPSA does not provide a forum to litigate whether or not a major oil pipeline should be constructed, but instead is limited to the issue of whether or not to approve a particular pipeline route.

On March 31, 2017, the hearing officer for the PSC issued an "Order on Formal Intervention Petitions." The order explained that, under § 57-1408(2), the applicable statutory deadline for the PSC's decision was "eight months after the issuance of a presidential permit authorizing the construction of the major oil pipeline." The presidential permit for the pipeline was issued on March 23, which meant that the PSC was required to issue its final decision on the application by November 23. The order stated that the decisions on the petitions for intervention were reached by balancing the strict deadline under MOPSA with the need to produce a complete record and afford all interested parties an opportunity to be heard.

The order granted petitions for formal intervention filed by the landowners with no limitations or conditions. The order granted petitions for formal intervention filed by three different unions: the Midwest Regional Office of the Laborers International Union of America (LiUNA); the International Brotherhood of Electrical Workers, Local Union No. 265; and the United Association of Journeymen and Apprentices of the

Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO (UA). The order imposed conditions on the unions' participation by ordering them to jointly offer testimony from one witness at the public hearing, participate in limited discovery, collaborate on cross-examination of up to 1 hour per witness, and submit one joint brief.

The order granted petitions for formal intervention filed by the Ponca Tribe of Nebraska (Ponca) and the Yankton Sioux Tribe of South Dakota (Yankton Sioux). Ponca's petition stated it had a direct interest in the proceedings because the routes pass through its traditional, aboriginal, and federally recognized territory, which contains "historic, cultural, sacred and archaeological natural resources." Yankton Sioux's petition stated that the proposed pipeline would "traverse [its] ancestral territory" and that it had an interest in preserving "cultural, spiritual, and historic sites." The hearing officer found that "neither petition cite[d] a legally cognizable current real property interest in land encompassing the route," but noted that § 57-1407(4)(d) requires the PSC "to consider evidence of the social impacts of the project," and found that evaluating social impacts could encompass cultural, anthropological, and historical issues. The order imposed conditions on the tribes' petitions similar to those imposed on the unions.

The order granted petitions for formal intervention, subject to the same or similar conditions, filed by groups and individuals asserting environmental and natural resource interests, including Bold Alliance and the Sierra Club. The order stated that under MOPSA, the PSC is prohibited from evaluating safety considerations such as "the risk or impact of spills or leaks from the major oil pipeline," but found that the PSC could appropriately consider issues such as the proposed route's "environmental impact, soil permeability, distance to groundwater, and impact on plant life and wildlife."

The order on the petitions for intervention concluded with a separate section devoted to addressing the MAR. The order stated that "[MOPSA] requires the [PSC] to consider whether

any other utility corridor exists that could feasibly and beneficially be used for the route of the major oil pipeline," and that the MAR "partially parallels [Keystone I]." The order therefore "encourage[d] all parties to provide evidence regarding the feasibility and potential benefits and/or drawbacks of the [MAR]." The order granted each intervenor group permission to call an additional witness and offer accompanying exhibits to provide evidence concerning the MAR. The order noted that the SAR "was previously rejected by Nebraska authorities" and therefore has "already effectively been determined to not be a viable option."

On April 5, 2017, the hearing officer entered a case management order. The order set a prehearing conference for July 31 and announced that a public hearing on TransCanada's application would commence on August 7 in Lincoln, Nebraska. The order stated that the PSC may hold public meetings "for the purpose of receiving input from the public" and that "[a]ny comments received will be made a part of the permanent record of this proceeding." All parties were required to submit written testimony in advance and make witnesses available for cross-examination at the public hearing. The order stated that "any/all Hearing Officer Orders . . . will apply to and bind all parties, will control the course of the proceedings, and may be modified only by order of the Hearing Officer."

The PSC published notice of the public hearing on TransCanada's application in The Daily Record newspaper on April 11, 2017. The notice also announced that the PSC would hold a public meeting in Lincoln on April 18. The PSC published notice of its August 7 public hearing in newspapers in counties along the MAR and the PR, and sent letters to the governing bodies of the cities and counties along both routes notifying them that the pipeline route could pass through their jurisdiction and seeking their views on whether that would be in the public interest. The letters indicated that the application was available on the PSC's website.

On May 3, 2017, the PSC held a public meeting in York, Nebraska. On May 10, "after careful and thoughtful deliberation and reflection of the variety of public comment received by the [PSC] at the [public meeting]," the hearing officer entered an order "[m]odifying [c]ase [m]anagement [p]lan and [i]ntervention [o]rder." The order allowed each intervenor group to present testimony from two witnesses, in addition to a "witness regarding the [MAR] as detailed in the [intervention order]."

On June 7 and 28 and July 26, 2017, the PSC held additional public meetings in York, O'Neill, Norfolk, and Ralston, Nebraska, respectively, and received over 450 oral and written comments from the public.

## 5. Public Hearing

The PSC held a public hearing on TransCanada's application from August 7 to 10, 2017, in Lincoln. TransCanada submitted prefiled direct examination testimony from 10 witnesses, presented each witness for cross-examination, and filed rebuttal testimony from 6 witnesses. The landowner intervenors prefiled testimony from 61 witnesses and offered live testimony from 10 landowners and 1 expert witness. Ponca and Yankton Sioux each presented testimony from one witness. The natural resource intervenors presented testimony from three witnesses, and the union groups presented testimony from two witnesses.

We provide a summary of the presentation of evidence at the public hearing, along with context added from the thousands of pages of pleadings, exhibits, testimony, and briefs in the record before the PSC.

### (a) TransCanada Testimony

#### (i) Tony Palmer

Tony Palmer is the president of TransCanada Keystone Pipeline GP, LLC, and TransCanada Keystone, LLC, which together own 100 percent of TransCanada, a company organized for the purposes of owning and constructing pipelines which transport crude oil from Canada to the United States.

Palmer is responsible for development and oversight of the pipeline project. He testified in support of the request for approval of the PR as set forth in the application. Palmer stated the PR was designed by drawing the "shortest footprint . . . from Hardisty, Alberta, to Steele City."

Palmer estimated the initial use of the pipeline would be 20 years, which could be extended to 50 years if it was well maintained. Palmer confirmed that TransCanada is responsible for all reclamation costs associated with the project, unless another party is determined to be responsible. Palmer represented that TransCanada and all affiliated parties will not claim any tax deductions, exemptions, credits, refunds, or rebates under the Nebraska Advantage Act, Neb. Rev. Stat. §§ 77-5701 to 77-5735 (Reissue 2009), and testified that "we do not consider selling the route an option." Palmer stated that based on TransCanada's studies and the studies conducted by the DEQ and the Department, he considered the PR to be superior to the MAR.

### (ii) Paul Fuhrer

Paul Fuhrer, the project manager for TransCanada USA Services Inc., testified regarding the construction process for the proposed pipeline and pump stations. Fuhrer stated the top of the pipeline will sit a minimum of 4 feet below the surface of land, and a minimum of 25 feet below the surface of a water stream. Each pump station will be placed an average of 55 miles apart and utilize approximately 8 to 10 acres of land, but could utilize up to 17 acres. Shutoff valves will be placed at intervals along the pipeline, based on hydraulics and other factors, and located within a 50-foot-by-50-foot fenced enclosure.

Fuhrer testified about the trenching operations designed to provide sufficient width and depth to support the pipeline. The construction and installation of a new pipeline would require segregating topsoil from subsoil 110 feet across, and digging trenches that are approximately 8 feet wide and 7 feet deep.

### (iii) Ernie Goss

Dr. Ernie Goss, a professor of economics at Creighton University and the principal of the "Goss Institute," testified regarding his "socioeconomic" impacts report. Goss concluded that the pipeline project would generate economic activity in Nebraska such as sales, wages, and jobs, and would contribute to the state and local tax bases. He estimated that construction of the pipeline would result in positive state and local tax revenue to exceed $264 million through the year 2034. Goss concluded that during the 2-year construction period, the project would generate a total of over $890 million in Nebraska, with a labor income of $326.6 million supporting an average of 3,397 jobs per year. He estimated that, during the operations period from 2020 through 2034, there would be an economic impact in Nebraska of $1.2 billion in output/sales, with labor income of $415.5 million supporting an average of 371.7 jobs per year. For property tax purposes, Goss considered the pipeline to be a 15-year asset which would depreciate out, except to the extent that facilities are added, replaced, or maintained.

Goss employed an input-output method, a type of applied economics analysis that "tracks the interdependence among various producing and consuming sectors of an economy." For example, Goss asserted that each $1 million TransCanada spends on construction would create a net economic gain of $286,522 in Nebraska and that each $1 million TransCanada spends on operation would create a net gain of $150,000. Goss used "IMPLAN" software in forecasting the economic impact of the pipeline. IMPLAN combines input-output analysis with regional-specific statistics. Goss stated that IMPLAN is a widely used and accepted multiplier system, but agreed that IMPLAN is limited in its ability to determine whether "jobs or output are new or already existing and are simply being reallocated from other uses."

Goss' report did not disclose the scope of his engagement, but he stated that he was engaged to update his report, initially published in 2013, to reflect the most current data. He did not

recall how much he had been paid by TransCanada. He admitted the report was not peer reviewed and stated: "The goal was to do a study that made sense to the woman and man on the street . . . ."

### (iv) Sandra Barnett

Sandra Barnett, an environmental specialist for TransCanada Corporation, testified regarding environmental issues. Her testimony reiterated TransCanada's commitment to comply with the Oil Pipeline Reclamation Act and to minimize potential impacts on land areas and natural resources. Barnett admitted that for affected cropland, "[t]here would be temporary yield loss during construction and perhaps for a period of time afterward," but stated that TransCanada will reclaim and revegetate the right-of-way and work with the affected landowners to return it "as close as we can make it" to preconstruction condition.

Barnett stated that if a dispute occurs between TransCanada and a landowner about the postconstruction condition of land, the parties will reach a resolution by consulting the Natural Resources Conservation Service (NRCS), a division of the U.S. Department of Agriculture, or other agencies, and include them in the discussion in order to reach a resolution. Regarding surface water resources, Barnett admitted that during construction, there potentially will be temporary degradation to groundwater quality and aquatic habitat, as well as bank stability.

### (v) John Beaver

John Beaver, a project manager, ecologist, and reclamation specialist with an environmental services company, has been the senior reclamation specialist and special-status species biologist for the project since 2009. He stated that TransCanada will monitor the condition of the right-of-way during the pipeline's entire operational life. He admitted that TransCanada's land surveys and "Construction Mitigation and Reclamation Plan" (CMRP) for Nebraska have not been updated since 2012.

### (vi) Michael Portnoy

Michael Portnoy, the president and chief executive officer of an environmental consulting and engineering firm, is the lead hydrologist and project manager for soil permeability and distance-to-groundwater surveys. He has academic degrees in geology, geochemistry, hydrology, and business administration. He testified that there is a wide diversification of soil along the PR; he did not separately study the soil along the MAR.

### (vii) Dr. Jon Schmidt

Dr. Jon Schmidt, vice president of the management contractor for the pipeline project, helped prepare TransCanada's application. He testified the application compared the different routes based on the number of acres disturbed, federally listed threatened and endangered species, amount of highly erodible soils, ecologically sensitive areas, and number of crossings of perennial streams, railroads, and roads. He did not analyze the route referred to as the "I-90 Route," which would co-locate with the entire length of Keystone I.

On cross-examination, Schmidt agreed that the MAR "ha[d] potential environmental benefits due to its co-location with [Keystone I]." He agreed that the PR crosses five Nebraska rivers and the MAR crosses only two rivers, but stated the MAR crosses more "perennial waterbodies." He agreed that according to a map received in evidence, both the PR and the MAR cross the "Ponca Trail of Tears."

### (viii) Meera Kothari

Meera Kothari, a professional engineer and manager for TransCanada, helped prepare the section of the application which addressed the possible routes. She agreed that the MAR could "feasibly" and "beneficially" be used in Nebraska. She testified that the MAR's deviation from Keystone I in Seward County was to "avoid the wellhead protection area based on the feedback from the DEQ" and confirmed that "there are no wellhead protection area issues on either" the PR or the MAR.

### (b) Landowner Intervenors
### Testimony

The PSC heard testimony from the landowners focusing on issues of soil compaction, topsoil loss, wind and water erosion, soil blowouts and slides, adverse impacts to crops based on increased soil temperature, and proximity of pipeline construction to water sources. The landowners also provided expert testimony on the issue of economic impact.

#### (i) Arthur Tanderup

Arthur Tanderup owns farmland in Antelope County. He and his wife conduct no-till, irrigated farming and raise corn, native corn, soybeans, and rye. He described his land as highly erodible and testified that construction will interfere with the topsoil and the benefits of no-till farming.

#### (ii) Frank Morrison

Frank Morrison owns farmland in Antelope County, where he and his wife produce popcorn, edible beans, and peanuts. The land farmed by Morrison contains 65 irrigation wells. He testified the proposed route runs approximately 1½ miles from his processing facilities and intersects his property almost in half.

#### (iii) Robert Krutz

Robert Krutz owns land in Antelope County. He and his wife raise "natural beef," corn, and soybeans. Krutz testified that the construction could put his natural beef certification at risk, which would affect his market sales. He stated his concerns about the continued revegetation of his land which supports his livestock.

#### (iv) Jeanne Crumly

Jeanne Crumly owns land in Holt County. She and her husband conduct no-till, irrigated farming and raise corn, soybeans, hay, and potatoes. She testified that the pipeline will impact erodible and permeable soils.

### (v) Bonny Kilmurry

Bonny Kilmurry owns land in Holt County. She and her husband have a cow-calf operation, and they harvest hay from pastureland. Her land contains subirrigated meadows with water close to the surface, as well as highly erodible soils, which she described as being similar to Sandhills land.

### (vi) Diana Steskal

Diana Steskal owns land in Holt County. Steskal owns no-till, irrigated farmland that produces wheat, corn, soybeans, edible beans, and popcorn, and she urged for the protection of the natural resources on her land.

### (vii) Andy Grier

Andy Grier is a manager of a ranch in Holt County. He testified about the pipeline's crossing of the Niobrara River, the potential soil erosion from land clearing, and the proximity of the pipeline to his ranch's water supplies.

### (viii) Robert Allpress

Robert Allpress owns ranchland on the eastern border of Keya Paha County. He stated the proposed route will cross through fragile soil that is susceptible to blowouts and slides and that many plants and animals will be endangered. He testified he has observed a bald eagle's nest and whooping cranes in areas near his property. In addition, he testified that members of the Ponca and Yankton Sioux have surveyed his property and have identified "culturally significant sites."

### (ix) Dr. Michael O'Hara

Dr. Michael O'Hara, an economics professor at the University of Nebraska at Omaha, analyzed the economic impact of the proposed pipeline in Nebraska and reviewed Goss' socioeconomic report. O'Hara opined that the pipeline would decrease the value of property on the route by approximately 15 percent, and he concluded that the pipeline would

"reduce the emotional attitude of property owners towards their property." On cross-examination, he admitted that he did not evaluate the Department's conclusion that the project would not have a negative impact on property values and would have a positive economic impact through job creation and earnings. He opined that the project would create few permanent jobs. He disagreed with Goss' conclusions about the increased property tax revenues generated by the pipeline, but acknowledged that TransCanada will be obligated to pay significant sales and use taxes.

### (c) Yankton Sioux Testimony

Jason Cooke, a member of the Yankton Sioux's business and claims committee, the executive body of Yankton Sioux, testified the pipeline would cross the tribe's ancestral territory and would disturb cultural resources. Cooke said he expected that the pipeline would encounter burials, ceremonial areas, historic trails, and food and medicine gathering areas. In addition, he objected to a temporary camp that TransCanada may build for its pipeline workers approximately 40 miles from a Yankton Sioux reservation. Cooke stated that such camps are a source of violence and drugs and that the pipeline workers would be drawn to the tribe's casino in South Dakota.

### (d) Ponca Testimony

Shannon Wright, the Ponca's tribal historic preservation officer, stated that the PR and the MAR cross the Ponca Trail of Tears and that construction of either route could damage or destroy historic sites. Wright stated that the MAR would cross near Ponca's service areas in the Nebraska counties of Boyd, Holt, Madison, Stanton, and Platte. Wright agreed that impacts from construction would be alleviated if TransCanada conducted the cultural surveys identified in the "Programmatic Agreement" (PA) and that there will be time before construction for TransCanada to complete these surveys.

#### (e) Natural Resources Intervenors Testimony

##### (i) Dr. Paul Johnsgard

Dr. Paul Johnsgard, a University of Nebraska-Lincoln professor emeritus of biological sciences, has extensively researched the biology of whooping cranes. Johnsgard asserted that the pipeline would require placing additional electric transmission lines in the whooping cranes' central migration path. He agreed that the risk posed by the project is "small."

##### (ii) Dr. Thomas David Hayes

Dr. Thomas David Hayes, the lead scientist and executive director of a nonprofit corporation providing research and technical services on environmental matters, testified the pipeline project would adversely impact natural resources "due to decreased soil permeability and increased soil compaction in both natural areas and croplands." He further stated that construction would "seriously deplete native prairie." Comparing the PR and the MAR, Hayes concluded that "the [MAR's] impact upon federally listed species is significantly less than that of the [PR], primarily due to the [MAR's] impacting 84.6 fewer miles of whooping crane habitat." He stated that the application

> downplays the measurable benefits of co-locating the [MAR]. With 88.3 and 102.2 more miles, respectively, of pipeline and total co-location, compared to the [PR], the [MAR] substantially decreases its overall impact by reworking far more industrially impacted areas and, consequently, reducing impacts to relatively undisturbed land. . . . [I]n this manner, irreparable damage to important natural resources, including native soils and grasslands, is proportionally reduced.

##### (iii) Joseph Trungale

Joseph Trungale, a consultant specializing in hydrology and instream flows, testified about the physical, chemical, and biological impacts associated with the pipeline's interaction with stream channels. He stated there was insufficient

information about mitigation of stream channel erosion and that shallow aquifers could be affected.

### (f) Economic Intervenors Testimony

#### (i) David Barnett

David Barnett, an international representative assigned to the pipeline and gas distribution department for UA, testified that UA has worked with TransCanada on several recent projects and that the pipeline project would have a positive economic impact on UA. He estimated that UA could expect 564 jobs for the construction phase of the project.

#### (ii) Bill Gerhard

Bill Gerhard, a special representative of LiUNA, testified that the pipeline project would have a positive economic impact on LiUNA and its members. He stated the project would create several different types of energy-related jobs, including pipeline construction and pump station jobs.

### 6. Closing Arguments

In their written closing remarks, the landowner intervenors argued that TransCanada's application should be denied for failure of proof. The landowners argued in the alternative that the PSC had the power to approve an alternate route, so long as the route followed Keystone I.

Bold Alliance and the Sierra Club asserted in their written closing argument that "[the] PSC has the authority to approve or disapprove of each route location by considering the benefits and feasibility of each of the proposed routes." They argued that the PR should be denied, because it has more negative impacts than the MAR, and that the PSC should approve the I-90 Route.

Ponca opposed both the PR and the MAR. Yankton Sioux argued about the risks associated with the camps for pipeline workers. The unions urged the PSC's approval of the application, because the project would bring jobs and other tangible

economic benefits to their members and the communities in which they reside and work.

## 7. PSC's Order Granting TransCanada's Application

On November 20, 2017, the PSC issued an order approving TransCanada's application, by a 3-to-2 vote, and finding the MAR to be in the public interest. The PSC began its findings by stating that MOPSA limits the PSC's authority to "a review of the proposed *route* only. The [PSC] is *not* to determine whether or not the pipeline project, or the pipeline itself, should be built." (Emphasis in original.) The PSC further stated, "[T]he Legislature has given the [PSC] the limited responsibility of determining whether the route of the pipeline is in the public interest." In making its public interest determination, the PSC discussed and analyzed each of the eight factors for consideration under § 57-1407(4), which provides:

The pipeline carrier shall have the burden to establish that the proposed route of the major oil pipeline would serve the public interest. In determining whether the pipeline carrier has met its burden, the commission shall not evaluate safety considerations, including the risk or impact of spills or leaks from the major oil pipeline, but the commission shall evaluate:

(a) Whether the pipeline carrier has demonstrated compliance with all applicable state statutes, rules, and regulations and local ordinances;

(b) Evidence of the impact due to intrusion upon natural resources and not due to safety of the proposed route of the major oil pipeline to the natural resources of Nebraska, including evidence regarding the irreversible and irretrievable commitments of land areas and connected natural resources and the depletion of beneficial uses of the natural resources;

(c) Evidence of methods to minimize or mitigate the potential impacts of the major oil pipeline to natural resources;

(d) Evidence regarding the economic and social impacts of the major oil pipeline;

(e) Whether any other utility corridor exists that could feasibly and beneficially be used for the route of the major oil pipeline;

(f) The impact of the major oil pipeline on the orderly development of the area around the proposed route of the major oil pipeline;

(g) The reports of the agencies filed pursuant to subsection (3) of this section; and

(h) The views of the governing bodies of the counties and municipalities in the area around the proposed route of the major oil pipeline.

The PSC found that TransCanada had produced sufficient evidence to satisfy the relevant statutory considerations. The PSC gave significant weight to subsection (e), and ultimately approved the MAR rather than the PR based on that subsection. The PSC found that the MAR utilized an existing utility corridor, Keystone I, for approximately 100 miles. The PSC declined to approve the I-90 Route, because TransCanada's construction permit in South Dakota required crossing into Nebraska in Keya Paha County, and the entry point for the I-90 Route is over 100 miles to the east.

The PSC found that "the [PR] fails to take advantage of any opportunity to co-locate with the existing utility corridor represented by Keystone I, and therefore we are unable to conclude that the [PR] is in the public interest." The PSC relied on testimony provided by TransCanada's engineer, Kothari, who stated that the MAR was viable and beneficial. The PSC stated, "We see many benefits to maximizing the co-location of the Keystone XL Pipeline with Keystone I. It is in the public interest for the pipelines to be in closer proximity to each other, so as to maximize monitoring resources and increase the efficiency of response times." The PSC further agreed with the intervenors that the MAR impacts fewer miles of endangered species and has other comparative environmental benefits. The

PSC stated, "[TransCanada] cites the additional [5] miles in length and one . . . additional pumping station as negatives against the [MAR]. However, we feel the benefits of maximizing co-location opportunities and utilizing the existing utility corridor that is . . . Keystone I . . . outweighs these concerns." The PSC found that the MAR "is in the public interest and shall be approved," and granted TransCanada's application.

### 8. Motions for Reconsideration

Several parties moved for reconsideration. TransCanada's motion requested leave to file an amended application "to make the [MAR] [TransCanada's] [PR]."[18] Following oral argument, the PSC denied the motions. The landowner intervenors filed a notice of appeal. We moved the case to our docket on our own motion pursuant to our authority to regulate the caseloads of the appellate courts of this state.[19]

### II. ASSIGNMENTS OF ERROR

The landowners assign, restated and consolidated, that (1) the PSC lacked jurisdiction to consider the application, (2) the PSC erred in finding that TransCanada sustained its burden of proof, (3) the PSC erred by approving the MAR, (4) the PSC erred in admitting hearsay evidence under § 57-1407(2) and (3), and (5) the PSC erred in denying the landowners procedural due process. The landowners also assert constitutional challenges to various statutes.

On cross-appeal, Ponca assigns, restated, that (1) the PSC erred in limiting its participation to social and cultural issues and limiting its witnesses and cross-examination time; (2) the PSC erred in approving the MAR because TransCanada never applied for approval of the MAR, the notice requirements related to the MAR were not met, and TransCanada did not meet its burden of proof with respect to the MAR; and (3) the PSC erred in limiting its consideration of historic

---

[18] Brief for appellee TransCanada at 11.

[19] See Neb. Rev. Stat. § 24-1106 (Cum. Supp. 2018).

and cultural resources to those covered by the National Historic Preservation Act, 54 U.S.C. § 300101 et seq. (Supp. III 2015).

On cross-appeal, Yankton Sioux assigns, restated and consolidated, that the PSC erred by (1) approving a route which does not serve the public interest, (2) violating Yankton Sioux's procedural due process and equal protection rights, and (3) applying § 84-912.02 of the Administrative Procedure Act (APA)[20] instead of the PSC's intervention regulations to limit Yankton Sioux's participation. Yankton Sioux also joins in the errors assigned by the landowner appellants.

The Sierra Club filed a brief but did not include any assignments of error.

## III. STANDARD OF REVIEW

[1-3] A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law.[21] The meaning and interpretation of statutes and regulations are questions of law for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[22] The determination of whether the procedures afforded to an individual comport with constitutional requirements for procedural due process presents a question of law.[23]

[4-6] Under Neb. Rev. Stat. § 75-136(2) (Reissue 2018), an appellate court reviews an order of the PSC de novo on the record.[24] In a review de novo on the record, an appellate

---

[20] Neb. Rev. Stat. §§ 84-901 to 84-920 (Reissue 2014 & Cum. Supp. 2016).

[21] *In re Grand Jury of Douglas Cty.*, 302 Neb. 128, 922 N.W.2d 226 (2019).

[22] *In re Petition of Golden Plains Servs. Transp.*, 297 Neb. 105, 898 N.W.2d 670 (2017).

[23] *Cain v. Custer Cty. Bd. of Equal.*, 298 Neb. 834, 906 N.W.2d 285 (2018).

[24] *In re Application No. B-1829*, 293 Neb 485, 880 N.W.2d 51 (2016); *Telrite Corp. v. Nebraska Pub. Serv. Comm.*, 288 Neb. 866, 852 N.W.2d 910 (2014). See *In re Claims Against Pierce Elevator*, 291 Neb. 798, 868 N.W.2d 781 (2015).

court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue.[25] When an appellate court makes a de novo review, it does not mean that the court ignores the findings of fact made by the agency and the fact that the agency saw and heard the witnesses who appeared at its hearing.[26] Where the evidence is in conflict, the Supreme Court will consider and may give weight to the fact that the agency hearing examiner observed the witnesses and accepted one version of the facts rather than another.[27]

Lastly, Neb. Ct. R. App. P. § 2-109(D)(1)(d), (e), and (f) (rev. 2014) requires that the brief of an appellant include a separate section for assignments of error, designated as such by a heading, and also requires that the section be located after a statement of the case and before a list of controlling propositions of law.[28] When a party fails to follow the rules of the Nebraska Supreme Court, an appellate court may proceed as though the party had failed to file a brief or, alternatively, may examine the proceedings for plain error.[29]

The Sierra Club attempted to file an appeal in this case, but failed to set forth any assignment of error in its brief. In addition to considering the assignments of error raised by the landowners, Ponca, and Yankton Sioux, we will consider whether the PSC committed plain error. Plain error is error plainly evident from the record and of such a nature that to leave it

---

[25] *Id.*

[26] See, *Law Offices of Ronald J. Palagi v. Dolan*, 251 Neb. 457, 558 N.W.2d 303 (1997); *Department of Health v. Lutheran Hosp. & Homes Soc.*, 227 Neb. 116, 416 N.W.2d 222 (1987).

[27] *Dieter v. State*, 228 Neb. 368, 422 N.W.2d 560 (1988).

[28] *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014); *In re Interest of Jamyia M.*, 281 Neb. 964, 800 N.W.2d 259 (2011).

[29] *Steffy v. Steffy, supra* note 28. See *In re Interest of Jamyia M., supra* note 28.

uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[30]

## IV. ANALYSIS

[7] The PSC is an independent regulatory body created by the Nebraska Constitution in article IV, § 20.[31] The powers and duties of the PSC include the "general control of common carriers as the Legislature may provide by law."[32] The constitutional provision creating the PSC must be liberally construed to effectuate the purpose for which the PSC was created, which is to serve the public interest.[33] In the absence of specific legislation, the powers and duties of the PSC, as enumerated in the constitution, are absolute and unqualified.[34]

[8] We have repeatedly said that the determination of what is consistent with the public interest, or public convenience and necessity, is one that is peculiarly for the determination of the PSC.[35] "'[C]ourts must give substantial deference to [the PSC's] judgment about how best to serve the public interest.'"[36] We have made this statement in recognition of the PSC's status as a constitutional entity, and we have gone as far as to state that the "Supreme Court does not act as an appellate

---

[30] *Id.*

[31] *Amend v. Nebraska Pub. Serv. Comm.*, 298 Neb. 617, 905 N.W.2d 551 (2018).

[32] Neb. Const. art. IV, § 20.

[33] See *Myers v. Blair Tel. Co.*, 194 Neb. 55, 230 N.W.2d 190 (1975).

[34] See *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 37 N.W.2d 502 (1949).

[35] *Dahlsten v. Harris*, 191 Neb. 714, 217 N.W.2d 813 (1974). See, *Andrews Van Lines, Inc. v. Smith*, 187 Neb. 533, 192 N.W.2d 406 (1971); *Nebraska State Railway Commission v. Chicago & N. W. Ry. Co.*, 187 Neb. 369, 191 N.W.2d 438 (1971); *Ace Gas, Inc. v. Peake, Inc.*, 184 Neb. 448, 168 N.W.2d 373 (1969).

[36] *In re Application No. C-1889*, 264 Neb. 167, 178, 647 N.W.2d 45, 54 (2002).

[PSC]."[37] However, in 2013, the Legislature amended § 75-136(2) to change our standard of review from errors appearing on the record, as provided under the APA, to "de novo on the record."

We first addressed the "de novo on the record" standard of review for PSC cases in *Telrite Corp. v. Nebraska Pub. Serv. Comm.*[38] Prior to the amendment, a party appealed from the PSC under the APA, and the initial appeal was taken to district court, which conducted a de novo review on the record of the agency.[39] Our inquiry in appeals from a district court's decision under the APA is limited to whether the decision conformed to the law, was supported by competent evidence, and was neither arbitrary, capricious, nor unreasonable.[40] In *Telrite Corp.*, we rejected the PSC's argument that the previous, more deferential standard of review for an appellate court under the APA still applied after the amendment to § 75-136. In so finding, we stated that the PSC was not "due the same degree of deference it enjoyed" before the amendment.[41]

However, the issue of what deference is owed to the PSC regarding its public interest determinations is more nuanced than stated in *Telrite Corp*. Under MOPSA, the PSC views the witnesses and evaluates the strength of their testimony, receives comments from the public, investigates the issues presented in coordination with state agencies and authorized consultants, evaluates the public interest, and makes the initial decision of whether to approve an application and authorize eminent domain power. Under the circumstances, it is appropriate, even under a de novo standard of review, to adhere to the common

---

[37] *In re Application of Crusader Coach Lines*, 213 Neb. 53, 58, 327 N.W.2d 98, 101 (1982). Accord *In re Application of McCarty*, 218 Neb. 637, 358 N.W.2d 203 (1984).

[38] *Telrite Corp. v. Nebraska Pub. Serv. Comm., supra* note 24.

[39] See § 84-917(5).

[40] *Telrite Corp. v. Nebraska Pub. Serv. Comm., supra* note 24.

[41] *Id.*, 288 Neb. at 874-75, 852 N.W.2d at 916.

practice among appellate courts to afford appropriate deference to the findings of the agency before which the record was created.[42] We articulate this standard in light of the PSC's being constitutionally created to serve the public interest.

## 1. PSC Had Jurisdiction

The landowners and Yankton Sioux assert that the PSC lacked jurisdiction to approve TransCanada's application because, under the appellants' reading of MOPSA, the PSC cannot consider a route application unless the Governor has already considered and denied the application. We determine that under the plain language of MOPSA, prior gubernatorial denial is not required to initiate application proceedings before the PSC. MOPSA is an independent statutory process under which pipeline carriers may obtain route approval and eminent domain authority. Route approval by the Governor is not at issue in this case.

[9,10] Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[43] Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.[44]

The appellants' argument is based upon § 57-1405(1), which provides:

> If a pipeline carrier proposes to construct a major oil pipeline . . . and the pipeline carrier has submitted a route for an oil pipeline within, through, or across Nebraska

---

[42] See, *Law Offices of Ronald J. Palagi v. Dolan, supra* note 26; *Dieter v. State, supra* note 27; *Department of Health v. Lutheran Hosp. & Homes Soc., supra* note 26.

[43] *Mays v. Midnite Dreams*, 300 Neb. 485, 915 N.W.2d 71 (2018).

[44] *Davio v. Nebraska Dept. of Health & Human Servs.*, 280 Neb. 263, 786 N.W.2d 655 (2010).

*but the route is not approved by the Governor* pursuant to section 57-1503, the pipeline carrier shall file an application with the [PSC] and receive approval pursuant to section 57-1408 prior to beginning construction . . . .

(Emphasis supplied.)

Under the appellants' view, "the PSC may consider an application for a route if, *but only if*, the Governor of Nebraska first considered, and declined to grant, the proposed pipeline route within or across the State."[45] According to the appellants, "[d]isapproval is a prerequisite to PSC jurisdiction under § 57-1405(1)"[46] and "[t]he Governor must say 'No' first; then comes the PSC."[47]

It is clear that the appellants' interpretation is not strictly derived from the statutory text, but, rather, is an extrapolation thereof. The language of § 57-1405(1) is not phrased as a jurisdictional prerequisite, but, rather, describes a process for applying for a pipeline route that has "not [been] approved by the Governor." The appellants read the phrase "not approved by" to mean "must have first considered and denied." We do not agree. Logically, one can "not approve" something by taking no action. The phrase "not approved by" does not require the Governor to be the first to consider the application or to consider the application at all. As we explained in the background section of this opinion, the MOPSA application process is one of two options the Legislature has enacted to enable a pipeline carrier to pursue route approval. Though we conduct a textual analysis as to whether § 57-1405(1) or § 57-1101 authorizes the PSC to consider TransCanada's application, we offer no opinion as to the constitutionality of § 57-1101 or other references to the power of the Governor to approve the route.

Sections 57-1405(1) and 57-1101 relate to the same subject matter; they address the procedures available for a

---

[45] Brief for appellants at 14 (emphasis in original).

[46] *Id*. at 17.

[47] *Id*. at 15.

pipeline carrier to obtain route approval under Nebraska law. The current versions of these sections were adopted by the Legislature in the same bill, 2012 Neb. Laws, L.B. 1161, and MOPSA makes specific reference to § 57-1101.[48] Therefore, §§ 57-1405(1) and 57-1101 are in pari materia and we must construe them together.

Section 57-1101 provides in relevant part:

> [F]or any major oil pipeline . . . to be placed in operation in the State of Nebraska . . . , any such person, company, corporation, or association shall comply with section 57-1503 and receive the approval of the Governor for the route of the pipeline under such section *or* shall apply for and receive an order approving the application under [MOPSA], prior to having the rights provided under this section.

(Emphasis supplied.)

Section 57-1101 describes the two avenues for route approval, under § 57-1503 and MOPSA, and uses the word "or" to connect them. The word "or," when used properly, is disjunctive.[49] This indicates that a pipeline carrier can pursue either process individually. The processes are independent of each other and should not be understood as the same thing. There are several differences.

As described above, under § 57-1503, a pipeline carrier may not seek the Governor's approval of an application until after the DEQ has utilized State funds to prepare a SEIS and has submitted its evaluation to the Governor. In contrast, under MOPSA, a pipeline carrier initiates the proceedings, is required to prove that the route is in the public interest based on the PSC's evaluation of multifaceted statutory criteria, and must pay for the application process.[50] MOPSA does not require gubernatorial denial prior to initiating an application

---

[48] § 57-1408.

[49] See *Nebraska Protective Servs. Unit v. State*, 299 Neb. 797, 910 N.W.2d 767 (2018).

[50] See §§ 57-1405 and 57-1406.

proceeding. The appellants' assignment of error that the PSC lacked jurisdiction over TransCanada's application is without merit.

### 2. Evidence Supports PSC's Determination that TransCanada Met Burden of Proof

In their next assignment of error, the appellants argue that the PSC erred in finding that TransCanada sustained its burden of proof. Upon our independent review of the record before the agency, we find that sufficient evidence supports the PSC's decision that TransCanada met its burden of proving that the MAR is in the public interest. While the intervenors reduced the strength of TransCanada's evidence in certain areas, the intervenors' objections are not enough to overcome TransCanada's comprehensive presentation with respect to the relevant public interest factors under MOPSA.

Two possible misconceptions must be addressed. First, in evaluating a route, we are prohibited from considering safety issues. Nebraska cannot interfere with uniform safety standards utilized by the federal government. To do so would undermine MOPSA and jeopardize Nebraska's ability to review and scrutinize a pipeline route in this state under state law. Second, the MOPSA structure enacted by the Legislature concerns only the selection of a particular pipeline route. In this case, TransCanada, as well as some of the appellants, asked the PSC to approve construction of a particular pipeline route. The PSC considered the evidence and determined that the MAR is in the public interest.

[11,12] An application under MOPSA shall be approved if the proposed route of the major oil pipeline is determined by the PSC to be in the public interest.[51] MOPSA places the burden of proof on the applicant.[52] Although MOPSA does not specify a standard of proof, unless an exception applies,

---

[51] § 57-1407(4).

[52] *Id.*

only a preponderance of evidence is required in civil cases.[53] The burden of proof is satisfied by actual proof of the facts, of which proof is necessary, regardless of which party introduces the evidence.[54] In concluding that the MAR is in the public interest, the PSC properly relied on all record evidence and carefully weighed the eight factors under § 57-1407(4).

### (a) Compliance With Applicable Laws

The first factor for the PSC's consideration is "[w]hether the pipeline carrier has demonstrated compliance with all applicable state statutes, rules, and regulations and local ordinances."[55] TransCanada stated that it would comply with all applicable state statutes, rules, regulations, and local ordinances, and that it either has obtained or will obtain all permits necessary to comply with state laws, regulations, local ordinances, and zoning requirements. Moreover, TransCanada is required to comply with all applicable laws as a condition of its presidential permit. Palmer, the president of the companies that own TransCanada, reaffirmed these commitments under oath. These commitments apply to the construction, maintenance, and operation of the MAR. The record concerning § 57-1407(4)(a) supports the PSC's finding that TransCanada met its burden of proof.

### (b) Impact on Natural Resources

The PSC shall evaluate evidence of

the impact due to intrusion upon natural resources and not due to safety of the proposed route of the major oil pipeline to the natural resources of Nebraska, including evidence regarding the irreversible and irretrievable

---

[53] *Wetovick v. County of Nance*, 279 Neb. 773, 782 N.W.2d 298 (2010). See, *Pallas v. Dailey*, 169 Neb. 533, 100 N.W.2d 197 (1960); *Eggleston v. Quinn*, 88 Neb. 775, 130 N.W. 428 (1911).

[54] *Lincoln Fire Fighters Assn. v. City of Lincoln*, 198 Neb. 174, 252 N.W.2d 607 (1977).

[55] § 57-1407(4)(a).

commitments of land areas and connected natural resources and the depletion of beneficial uses of the natural resources.[56]

The evidence demonstrated that a large percentage of the land crossed by the pipeline is agricultural in nature and that the impacts of construction will be temporary.

The MAR avoids the Nebraska Sandhills, which provides several advantages as compared to the PR, when considering impacts on natural resources. As the PSC found, compared to the PR, the MAR will involve "one fewer river crossing, fewer wells within 500 feet of the pipeline, fewer acres of pivot irrigated . . . land crossed, fewer crossing of intermittent and perennial streams . . . , fewer miles of pipeline placed in areas with shallow groundwater, and fewer state highways and natural gas facilities to be crossed." The MAR "would impact 84.6 fewer miles of whooping crane migratory path as compared to the [PR]," as well as impact "fewer miles of the ranges" of other "threatened and endangered species." The natural resources intervenors' witness Hayes noted this fact in his conclusion that "the [MAR's] impact upon federally listed species is significantly less than that of the [PR]."

Hayes testified that, compared to the PR, the MAR substantially decreases the overall impact of the pipeline and stated that "irreparable damage to important natural resources, including native soils and grasslands, is proportionally reduced." TransCanada's witness Schmidt agreed that the MAR "ha[d] potential environmental benefits due to its co-location with [Keystone I]." Beaver, the senior reclamation specialist on the project, testified that construction of the pipeline would not significantly increase the impermeability of the soil.

The PSC requested the DEQ to analyze the environmental impact of the MAR. The DEQ responded that based on the mitigation commitments and reclamation procedures within the application, the MAR "would have minimal environmental

---

[56] § 57-1407(4)(b).

impacts in Nebraska." The DEQ then followed up with the PSC after further analyzing the relevant soils and sediment, groundwater, surface water, air, hazardous materials, and emissions, and again concluded that the MAR "would have minimal permanent environmental impacts in Nebraska." The record concerning § 57-1407(4)(b) supports the PSC's finding that TransCanada met its burden of proof.

### (c) Mitigation of Potential Impacts

The PSC shall evaluate "[e]vidence of methods to minimize or mitigate the potential impacts of the major oil pipeline to natural resources."[57] TransCanada provided a CMRP containing "construction, operation, and maintenance measures that are designed to reduce the likelihood and severity of impacts along the pipeline construction corridor and during operations." The CMRP outlines procedures for soil protection, water-crossing methods, vegetation reclamation, and aquatic resources protection. The CMRP was developed in consultation with the NRCS and experts from the University of Nebraska. The CMRP procedures will be used to minimize the environmental impact of the MAR and return the land disturbed by construction as close as possible to its preconstruction condition. The PSC concluded that TransCanada's procedures "conform to industry standards and are reasonable." Project manager Fuhrer testified that TransCanada will be accountable for production losses and other costs resulting from pipeline maintenance and damage to the land throughout the useful life of the pipeline.

The landowners noted that the CMRP has not been updated since 2012. However, the DEQ advised the PSC that the geology has not changed. The landowners emphasized that the CMRP allows TransCanada to deviate from the plan at its discretion. The PSC found that in the event a dispute arises regarding reclamation and mitigation efforts, the parties will consult the NRCS as a resource and follow the NRCS' advice. We agree

---

[57] § 57-1407(4)(c).

this resolution process is adequate. Because the NRCS helped formulate the CMRP and is familiar with the best reclamation and mitigation practices, the NRCS shall be consulted in any instance in which a dispute arises and TransCanada has deviated from the CMRP. The record concerning § 57-1407(4)(c) supports the PSC's finding that TransCanada met its burden of proof.

### (d) Social and Economic Impacts

The PSC shall evaluate "[e]vidence regarding the economic and social impacts of the major oil pipeline."[58]

#### (i) Economic Impacts

Goss' report found that the pipeline project would constitute an economic benefit to Nebraska and would contribute to the state and local tax bases. He found that the pipeline project would result in positive tax revenue to exceed $264 million through the year 2034. His report assumed that only 10 percent of pipeline work in Nebraska would be conducted by Nebraska residents and that 7.3 percent of related pipeline work in Montana and South Dakota would be conducted by Nebraska residents. The report indicated that Goss' estimates were conservative. The analysis did not include taxes generated from the cost and installation of replacement materials or TransCanada's preconstruction spending. In addition, the dollar figures were not adjusted for inflation, but were discounted to the equivalent of "2015 dollars."

The unions also presented evidence of positive economic impacts. Barnett testified that UA has worked with TransCanada on recent projects and estimated that UA could expect 564 jobs for its members. Gerhard of LiUNA stated the project presents significant opportunity for the creation of several different types of energy-related jobs. O'Hara, the professor who analyzed the economic impact of the proposed pipeline, testified that the project would not provide long-term tax benefits,

---

[58] § 57-1407(4)(d).

would create few permanent jobs, and would adversely impact property values. However, O'Hara's analysis predominantly focused on issues of safety. O'Hara admitted that TransCanada will pay significant sales and use taxes. In addition, O'Hara's conclusions regarding tax benefits assume that, contrary to the evidence, TransCanada will seek exemptions under the Nebraska Advantage Act. The PSC found that TransCanada "shall comply with its commitment to not use the Nebraska Advantage Act in any form in connection with the Keystone XL Project."

Nebraska's Department of Revenue found that during construction, TransCanada or its contractors would incur significant sales and use tax liabilities, and that Nebraska would experience an increase in individual income tax revenue. The DEQ and the Department found that the pipeline was not expected to have an impact on residential or agricultural property values and would generate a substantial amount of new economic activity, millions of dollars in annual property tax revenue, and hundreds of jobs for Nebraskans. O'Hara opined that property values would decrease by 15 percent and that property taxes would decrease over the life of the pipeline.

The PSC found that "much of the economic testimony was conflicting," but concluded that the pipeline would accrue an economic benefit in Nebraska, and that Nebraska will "benefit from the investment and activity that is associated with the pipeline construction and operation."

### (ii) Social Impacts

The evidence of social impacts primarily concerned impacts on cultural resources and impacts from a temporary camp for pipeline workers that may be built in Holt County. MOPSA does not specifically state that the PSC must evaluate impacts on cultural resources. As noted, § 57-1407(4)(d) states the PSC shall consider "[e]vidence regarding the economic and social impacts of the major oil pipeline." The parties and the PSC understood the cultural resources issue to be a piece of the PSC's obligation to consider evidence of social impacts. The

parties and the PSC generally understood "cultural resources" to mean "physical evidence of culturally and historically valued aspects of the human and natural environment on the landscape," as defined by the DEQ.

The preservation of historic resources is a matter of federal law governed by the National Historic Preservation Act. The Department has been designated the federal agency responsible for the review of TransCanada's permit, which has been determined to be a federal undertaking. Nebraska provides resources in coordination with this effort. Pursuant to Neb. Rev. Stat. § 82-118 (Reissue 2014), the Nebraska State Historical Society, under the direction of the Nebraska State Historic Preservation Officer, is the state agency responsible for carrying out the purposes and objectives of the National Historic Preservation Act.

Pursuant to the National Historic Preservation Act, Pub. L. No. 89-665, § 106, 80 Stat. 917, the Department, the Nebraska State Historic Preservation Officer, TransCanada, and various other state and federal agencies entered into an amended PA in December 2013. According to the Nebraska State Historical Society, a § 106 review identifies "arch[a]eological or historic resources . . . *listed* or *eligible* for listing in the National Register of Historic Places." The PA requires TransCanada to complete cultural resources surveys on all areas that would potentially be impacted by the proposed undertaking and to provide adequate mitigation in consultation with the Department, state and federal agencies, and Indian tribes. The PA requires TransCanada to avoid, when possible, adverse effects on known cultural resources. When unanticipated cultural resources are discovered, all construction within a 100-foot radius must cease and may only resume after the resources are evaluated and protected according to the requirements under the PA. The PA includes a "Tribal Monitoring Plan" that allows "tribal monitors with experience in the identification of cultural resources to monitor construction along the pipeline route." The CMRP also contains a commitment to

comply with any PA in order to minimize the impact on cultural sites along the route.

Ponca's witness Wright stated that construction of the pipeline could damage or destroy historic sites, but he acknowledged this concern would be addressed if TransCanada adhered to the PA. Ponca stated that the Ponca Trail of Tears would not be included within the PA's protections, because the trail is not listed on the National Register of Historic Places. However, the PA applies to any historical site eligible for inclusion on the national register, and furthermore, the PA commits TransCanada to protecting known cultural sites. TransCanada presented evidence that it is prepared to address the issue. TransCanada's application states that it intends to avoid culturally significant sites by rerouting the pipeline "to the extent practicable." Testimony at the hearing reflected that TransCanada has successfully avoided every eligible cultural site it has encountered thus far. TransCanada will have the opportunity to complete further cultural surveys prior to construction and to implement the necessary procedures under the PA.

Ponca assigns error to the PSC's determination that the preservation of cultural issues is a matter of federal law and argues that MOPSA requires an analysis with greater focus on Nebraska's cultural resources. We disagree with Ponca's characterization that the PSC did not evaluate the impact on Nebraska's cultural resources. In its analysis, the PSC articulated features of the federal scheme that are available to address the risks to local cultural resources. The PSC found that TransCanada's record of compliance with the PA and the National Historic Preservation Act showed TransCanada's compliance would likely continue and that the Department will require compliance with federal law. The PSC concluded that these safeguards "help to assure that the route of the pipeline will be in the public interest."

The Nebraska State Historical Society, the state agency responsible for preserving historic resources, informed the PSC that, according to the processes outlined in the PA,

TransCanada is required to "complete cultural resources surveys on all areas that would be potentially impacted," "make recommendations on National Register of Historic Places eligibility," and "provide adequate mitigation in consultation with the Department . . . , state and federal agencies, and Indian tribes." The Nebraska State Historical Society advised that these processes protect cultural resources.

Moreover, existing state laws protect cultural resources. Under Nebraska law, it is a crime to knowingly and willfully appropriate, excavate, injure, or destroy an archaeological resource on public land without written permission from the State Archaeology Office.[59] Neb. Rev. Stat. § 12-1205 (Cum. Supp. 2018) makes it a crime to knowingly fail to report the encounter of an unmarked human burial, and it requires the cessation of any activity that may disturb the burial. Neb. Rev. Stat. § 28-1301 (Reissue 2016) describes the offense of removing, abandoning, or concealing human skeletal remains or burial goods. TransCanada must comply with these laws.

The temporary camps for pipeline workers do not make approving the MAR contrary to the public interest. All such camps must be permitted, constructed, and operated consistent with applicable county, state, and federal regulations. TransCanada must require camp residents to comply with a written code of conduct and potentially expel those found in violation. The camps will be fenced and secured with video surveillance and a guardhouse, staffed at all times. Only authorized personnel will be granted access to the camps; no visitors will be permitted. The record concerning § 57-1407(4)(d) supports the PSC's finding that TransCanada met its burden of proof.

### (e) Other Utility Corridors

The PSC must evaluate "[w]hether any other utility corridor exists that could feasibly and beneficially be used for

---

[59] Neb. Rev. Stat. § 82-507 (Reissue 2014).

the route of the major oil pipeline."[60] The PSC interpreted the phrase "utility corridor" to mean "a passageway for facilities providing public services." The PSC gave significant weight to the fact that the MAR "was developed to maximize the length of co-location with [Keystone I]" and takes advantage of the fixed entry point in Keya Paha County. The PSC found the MAR to be the most beneficial route, because the PR failed to take advantage of an existing utility corridor. The appellants urged approval of the I-90 Route, but the PSC rejected that proposal based on the lack of a feasible entry point. Upon de novo review, we are persuaded that the MAR's co-location with Keystone I maximizes efficiency and reduces impacts to undeveloped land and natural resources.

The PSC evaluated the eight public interest factors under § 57-1407(4) and was persuaded by the evidence in favor of the MAR under § 57-1407(4)(e). The PSC's reasoning is compelling, because the record shows that by satisfying the considerations under § 57-1407(4)(e), the MAR's co-location with Keystone I enhances the overall strength of the route application and serves other public interest factors under § 57-1407(4). There is evidence to support the PSC's reasoning in giving great weight to TransCanada's evidence under § 57-1407(4)(e) in deciding that the MAR, rather than the PR or I-90 Route, is in the public interest. The record concerning § 57-1407(4)(e) supports the PSC's finding that TransCanada met its burden of proof.

### (f) Impact on Orderly Development of Area

The PSC must evaluate "[t]he impact of the major oil pipeline on the orderly development of the area around the proposed route of the major oil pipeline."[61] There was a lack of evidence that significant restrictions on development would occur. The PSC observed that while future developments

---

[60] § 57-1407(4)(e).

[61] § 57-1407(4)(f).

would need to avoid the pipeline, "similar restrictions on development occur in areas near other infrastructure, i.e., roads, bridges, dams, power lines, etc." The MAR mitigates interference with orderly development by co-locating with Keystone I. In addition, the CMRP's mitigation procedures address possible impacts of construction. The PSC's consultants concluded that the pipeline would "play an 'insignificant role in residential value, crop production, invasive species, and land development.'" We agree with the PSC that the impact on development of the area seems minimal. The record concerning § 57-1407(4)(f) supports the PSC's finding that TransCanada met its burden of proof.

### (g) State Agency Reports

The PSC must evaluate "[t]he reports of the agencies filed pursuant to subsection (3) of this section."[62] The PSC consulted all nine agencies listed within § 57-1407(3) on both the PR and the MAR. The agencies were familiar with the project based on prior efforts and did not express any concerns about the approval, denial, or relocation of either route.

As already noted, Nebraska's Department of Revenue found that the pipeline will generate revenue from sales taxes, use taxes, property taxes, and income taxes. The Nebraska State Historical Society stated that the necessary measures for protecting cultural resources are in place. The Nebraska Game and Parks Commission explained that it would help "avoid and minimize impacts on species and their habitats." And we reiterate the DEQ's finding that the MAR "would have minimal environmental impacts in Nebraska." The record concerning § 57-1407(4)(g) supports the PSC's finding that TransCanada met its burden of proof.

### (h) Views of Counties and Municipalities

The PSC must evaluate "[t]he views of the governing bodies of the counties and municipalities in the area around the

---

[62] § 57-1407(4)(g).

proposed route of the major oil pipeline."[63] The PSC sent letters soliciting input to 18 counties and 32 cities along both the PR and the MAR. Boone, Nance, Saline, and Seward Counties expressed their approval; Boyd and Holt Counties expressed their opposition. The PSC received no input from Butler, Colfax, Madison, Platte, or Stanton Counties. Seward, Nebraska, and Steele City submitted favorable responses. The record concerning § 57-1407(4)(h) supports the PSC's finding that TransCanada met its burden of proof.

We find that the PSC—after months of investigation reviewing extensive pleadings, exhibits, and reports from consultants; holding public meetings and a public hearing; considering written and oral arguments; deliberating; and issuing its opinion and findings—did not err in concluding that TransCanada proved by a preponderance of the evidence that approval of the MAR is in the public interest.

### 3. PSC PROPERLY CONSIDERED MAR

[13] In the appellants' next assignment of error, they argue that the PSC was not authorized to approve the MAR, because TransCanada applied for approval of only the PR, and that the notice requirements for the MAR were not met. While it is true that TransCanada requested in its application "an order from the PSC that the [PR] is in the public interest," we nevertheless find it indisputable that TransCanada included the MAR in its application and that the parties were on notice that the MAR was at issue. The rules of pleading are not applied in administrative proceedings as strictly as they are in court proceedings.[64] Administrative pleading rules require simply that the parties be sufficiently apprised of the nature of the proceedings so that there is no unfair surprise.[65]

The hearing officer for the PSC devoted a separate section of its intervention order to the MAR and made clear

---

[63] § 57-1407(4)(h).

[64] See *In re Appeal of Bonnett*, 216 Neb. 587, 344 N.W.2d 657 (1984).

[65] *Id.*

that the merits of the MAR would be considered. The order stated that the SAR would not be considered and informed the parties that they should be prepared to address the MAR by granting them leave to designate an additional witness and offer exhibits pertaining to the MAR. There was no objection to the MAR section of the order. The case management order stated that "any/all Hearing Officer Orders . . . will apply to and bind all parties, will control the course of the proceedings, and may be modified only by order of the Hearing Officer."

Following a prehearing conference, the hearing officer modified the intervention order by allowing each intervenor group to present testimony from two witnesses, "in addition to the ability to bring an additional witness regarding the [MAR] as detailed in the [intervention order]." The PSC's Rules of Commission Procedure provide that once an order is entered "a reasonable time will be allowed for the parties to present objections . . . . Thereafter, the terms of the order . . . determine the subsequent course of the proceedings . . . ."[66] Generally, the failure to object to the specifications in the pretrial order waives any right to claim error in that regard.[67] The pretrial order is binding upon the parties. The issues set out in a pretrial order supplant those raised in the pleadings.[68]

[14] The appellants also contend that the PSC denied them procedural due process. Due process requires notice and an opportunity for a full and fair hearing at some stage of the agency proceedings.[69] Contrary to the intervenors' assertions,

---

[66] 291 Neb. Admin. Code, ch. 1, § 020.04 (1992).

[67] See *Hillcrest Country Club v. N.D. Judds Co.*, 236 Neb. 233, 461 N.W.2d 55 (1990).

[68] See, *Hall v. County of Lancaster*, 287 Neb. 969, 846 N.W.2d 107 (2014), *overruled on other grounds, Davis v. State*, 297 Neb. 955, 902 N.W.2d 165 (2017); *Cotton v. Ostroski*, 250 Neb. 911, 554 N.W.2d 130 (1996). See, *Kustom Kreations v. Duxbury*, 216 Neb. 99, 342 N.W.2d 656 (1983); *Jonas v. Willman*, 27 Neb. App. 251, 930 N.W.2d 60 (2019).

[69] *Stoneman v. United Neb. Bank*, 254 Neb. 477, 577 N.W.2d 271 (1998).

the PSC's decision to approve the MAR is a reflection of the evidence and arguments presented. As already discussed, MOPSA "is intended to deal solely with the issue of siting or choosing the location of the route."[70] MOPSA allows Nebraska to exercise its sovereign authority "to protect its land and natural resources . . . by regulation through approval or disapproval of major oil pipeline siting and the location of routes."[71] MOPSA grants the PSC the authority to consult state agencies "regarding the advisability of approving, denying, or modifying the location of the proposed route of the major oil pipeline."[72] As explained, among the factors the PSC must evaluate is "[w]hether any other utility corridor exists that could feasibly and beneficially be used for the route of the major oil pipeline."[73]

The record contained extensive evidence concerning the MAR. There was significant overlap in the evidence concerning the routes; much of the evidence concerning the PR and Keystone I equally applied to the MAR. The PR and the MAR are the same route for the first 110 miles and approximately 97 of the MAR's remaining 170 miles co-locate with Keystone I. Several witnesses addressed these routes and the differences between them in their testimony.

Hayes testified that compared to the PR, the MAR substantially decreases the overall negative impacts of the pipeline. Kothari testified that the MAR was beneficial and feasible. Schmidt was questioned at length and in detail about the MAR to draw out comparisons between the MAR, the PR, and the I-90 Route. Wright provided testimony concerning the MAR. The consultants advised the PSC that there is little difference in soil characteristics between the PR and the MAR.

---

[70] § 57-1402(2).

[71] § 57-1403(1).

[72] § 57-1407(3).

[73] § 57-1407(4)(e).

The DEQ evaluated the MAR and informed the PSC that the MAR would have minimal permanent environmental impacts in Nebraska. The PSC heard evidence that TransCanada modified the MAR to avoid wellhead protection areas based on the DEQ's recommendations. Seward's city council recognized this and approved the MAR on that basis. Thus, the suggestion that the appellants were not afforded notice and an opportunity to be heard on the MAR disregards considerable portions of the record. Fundamental issues before the PSC were whether or not to approve the PR or the MAR.

Ponca argued that "*the PSC could decide it preferred the* [*MAR*] *based on the evidence*, but it was required to deny the [a]pplication for the [PR] and invite TransCanada to file a new application for the [MAR]."[74] Ponca's argument referred to § 57-1408(4), which provides in part that "[i]f the commission *denies* the application, the pipeline carrier may amend the *denied application* in accordance with the findings of the commission and submit the amended application within sixty days after the issuance of the *order denying the application*." (Emphasis supplied.) The record makes clear that the PSC granted the application, approved the MAR, and determined that amendment pursuant to § 57-1408(4) was unnecessary when it overruled TransCanada's motion for reconsideration. The PSC's decision was consistent with the policy under MOPSA to "[e]nsure that a coordinated and efficient method for the authorization of such construction is provided."[75] There was no need to amend the application, because the application was supplanted by the hearing officer's orders concerning the MAR when no party objected to the orders. The parties effectively tried the matter as one seeking approval of the MAR. Moreover, there was no need for the PSC to grant the motion to amend, because in the civil context courts have the power to constructively

---

[74] Reply brief for appellee Ponca on cross-appeal at 7 (emphasis supplied).

[75] § 57-1402(1)(e).

amend pleadings in order to render a decision consistent with the trial.[76]

Neither do we find a basis to reverse the PSC's decision due to a failure to satisfy MOPSA's notice requirements. The PSC published notice of the public hearing on TransCanada's application in newspapers in general circulation along both the PR and the MAR. The PSC sent letters to the governing bodies along both routes and advised them that a copy of the application is available online at the PSC's website. The PSC released additional press releases at the time the application was filed and provided notice of several public meetings and the public hearing.

[15,16] Furthermore, these intervenors waived the right to object based on lack of notice. It is generally held that participation in the hearing waives any defect in the notice.[77] If notice is materially lacking, then a timely objection will permit the public body to promptly remedy the defect and defer formal action until the required public notice can be given.[78] The intervenors failed to raise the issue of notice in response to the prehearing orders, at the public hearing, or in their motions for reconsideration. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the administrative agency.[79] This assignment of error is without merit.

### 4. Participation Claim Without Merit

Ponca and Yankton Sioux argue that the PSC improperly limited their participation to social and cultural issues. They

---

[76] See, *Denali Real Estate v. Denali Custom Builders*, 302 Neb. 984, 926 N.W.2d 610 (2019); *Zelenka v. Pratte*, 300 Neb. 100, 912 N.W.2d 723 (2018); *Blinn v. Beatrice Community Hosp. & Health Ctr.*, 270 Neb. 809, 708 N.W.2d 235 (2006).

[77] See, *Hansen v. City of Norfolk*, 201 Neb. 352, 267 N.W.2d 537 (1978); *Alexander v. School Dist. No. 17*, 197 Neb. 251, 248 N.W.2d 335 (1976).

[78] See *Witt v. School District No. 70*, 202 Neb. 63, 273 N.W.2d 669 (1979).

[79] *Betterman v. Department of Motor Vehicles*, 273 Neb. 178, 728 N.W.2d 570 (2007).

argue that their petitions alleged governmental and territorial interests and that the PSC's regulations allow the intervenors to present evidence on any express interest stated in a petition for intervention. They argue that the PSC improperly ordered them to combine their witnesses and cross-examination time. Yankton Sioux argues that the conditions imposed by the PSC violated its equal protection rights. TransCanada argues that this court lacks appellate jurisdiction to consider the intervenors' arguments, because the intervenors did not appeal from the PSC's order on petitions for intervention. The intervenors argue the intervention order was not a final order, because the order did not deny intervention.

### (a) Final Order

Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.[80] The jurisdictional issue before us is whether the intervenors' objections to the scope of their participation may be reviewed after their appeal from the PSC's judgment on the merits or whether the intervenors were required to appeal from the PSC's order on petitions for intervention.

[17] We have consistently held that an order denying intervention is a final order for purposes of appeal.[81] Here, the PSC's intervention order did not deny intervention, but, rather, granted petitions for intervention and imposed conditions on the scope of intervention. Such an order is not final in the traditional sense in that the order is not a final determination of the parties' rights. Moreover, agency orders granting petitions for intervention subject to conditions are interlocutory in

---

[80] *In re Grand Jury of Douglas Cty., supra* note 21.

[81] *Streck, Inc. v. Ryan Family*, 297 Neb. 773, 901 N.W.2d 284 (2017); *Basin Elec. Power Co-op v. Little Blue N.R.D.*, 219 Neb. 372, 363 N.W.2d 500 (1985). See, *Wayne L. Ryan Revocable Trust v. Ryan*, 297 Neb. 761, 901 N.W.2d 671 (2017); *Spear T Ranch v. Knaub*, 271 Neb. 578, 713 N.W.2d 489 (2006); *Shold v. Van Treeck*, 82 Neb. 99, 117 N.W. 113 (1908).

nature. Under the APA and Nebraska's Model Rules of Agency Procedure, an agency may modify an order imposing conditions on intervention at any time.[82]

The U.S. Supreme Court held in *Stringfellow v. Concerned Neighbors in Action*[83] that an order granting permissive intervention, subject to conditions, and denying intervention as of right was not an appealable order. The Court explained that an order denying intervention is subject to appellate review by necessity, because the petitioner has no right to appeal from any subsequent order or judgment in the proceeding.[84] Conversely, the imposition of conditions on intervention can be reviewed on appeal from a final judgment. Here, the PSC's intervention order did not deny the petitions for intervention and therefore was not a final order. The intervenors properly appealed from the PSC's judgment on the merits, and we have jurisdiction in such an appeal to consider their objections to the order which placed conditions on their participation.

### (b) Merits

[18] Agency regulations properly adopted and filed with the Secretary of State of Nebraska have the effect of statutory law.[85] Statutory language is to be given its plain and ordinary meaning, and we will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[86]

Pursuant to its authority under § 57-1410, the PSC adopted rules and regulations to carry out MOPSA. Under 291 Neb. Admin. Code, ch. 9, § 023.06 (2013), "The filing of petitions for intervention . . . and the conduct of the hearing shall be

---

[82] § 84-912.02(4); 53 Neb. Admin. Code, ch. 4, § 003.04 (1994).

[83] *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 107 S. Ct. 1177, 94 L. Ed. 2d 389 (1987).

[84] *Id.*

[85] *Tran v. State, ante* p. 1, 926 N.W.2d 641 (2019).

[86] *Id.*

governed by the Rules of Commission Procedure." Under the PSC's Rules of Commission Procedure, any person who has an interest in a proceeding before the PSC, who does not desire to file a formal protest, may file a petition of formal intervention and shall become a party to the proceeding.[87] Generally, one who intervenes becomes a party to the litigation and has all the rights of a party.[88] An intervenor can engage in discovery, file motions, introduce evidence, and examine witnesses, and file an appeal.[89]

The PSC's regulations further provide:

> A formal intervenor shall be entitled to participate in the proceeding to the extent of his/her express interest in the matter. Such participation shall include, without limitation, presentation of evidence and argument, cross-examination of witnesses and submission of rebuttal evidence. As a party, a formal intervenor shall have the right of appeal.[90]

The PSC is also an "agency" within the meaning of the APA, and the APA's provisions apply to the PSC.[91] The PSC has authority to take actions affecting parties subject to its jurisdiction if such action is taken pursuant to a statute.[92] The APA grants the PSC the power to impose conditions upon an intervenor's participation, and this action is distinct from granting or denying a petition for intervention.[93] Section 84-912.02(3) of the APA states in pertinent part:

---

[87] 291 Neb. Admin. Code, ch. 1, § 015.01 (1992).

[88] See *Brown v. Jacobsen Land & Cattle Co.*, 297 Neb. 541, 900 N.W.2d 765 (2017).

[89] *Id.*

[90] 291 Neb. Admin. Code, ch. 1, § 015.01C (1992).

[91] *Nebraska Pub. Serv. Comm. v. Nebraska Pub. Power Dist.*, 256 Neb. 479, 590 N.W.2d 840 (1999). See *Yellow Cab Co. v. Nebraska State Railway Commission*, 175 Neb. 150, 120 N.W.2d 922 (1963).

[92] See, Neb. Rev. Stat. § 75-110(1) (Reissue 2018); *In re Application No. C-1889, supra* note 36.

[93] See, § 75-110(2); § 84-912.02.

If a petitioner qualifies for intervention, the hearing officer or designee may impose conditions upon the intervenor's participation in the proceedings, either at the time that intervention is granted or at any subsequent time. Conditions may include:

. . . .
(b) Limiting the intervenor's use of discovery, cross-examination, and other procedures so as to promote the orderly and prompt conduct of the proceedings; and
(c) Requiring two or more intervenors to combine their presentation of evidence and argument, cross-examination, discovery, and other participation in the proceedings.

The PSC granted the petitions for formal intervention filed by Ponca and Yankton Sioux in recognition of their interests in the case, then limited the scope of their participation to the issues of impacts on social and cultural resources, as relevant under § 57-1407(4)(d) of MOPSA. The PSC stated it imposed these conditions "in order to balance the statutorily truncated timeframe [and] the need to consider certain statutorily required issues, with the parties' due process interests in being heard, and in the interest of maintaining an orderly proceeding."

The intervenors argue the conditions imposed by the PSC violated the PSC's own regulations. Ponca asserts that "the language [of the regulation] is clear — the evidence, argument, and cross-examination 'shall' be 'without limitation.'"[94] However, Ponca's argument departs from the plain meaning and organization of the language used in the regulation. The language provides that an intervenor's "participation shall include, without limitation, presentation of evidence and argument, cross-examination of witnesses and submission of rebuttal evidence."[95] We interpret this language according to its plain and ordinary meaning. Here, the phrase "without

---

[94] Brief for appellee Ponca on cross-appeal at 16.
[95] 291 Neb. Admin. Code, ch. 1, § 015.01C.

limitation" indicates that an intervenor is entitled to engage in each form of participation listed in that sentence, i.e., the intervenor will participate in the "presentation of evidence and argument, cross-examination of witnesses and submission of rebuttal evidence." In this context, "without limitation" does not mean, as Ponca argues, that an intervenor's participation shall be unlimited. Taken to its logical conclusion, the intervenors' position would eliminate basic procedural norms. For example, the intervenors' reading would eliminate a hearing officer's ability to "exclude evidence which is cumulative or repetitious."[96] The intervenors' interpretation of "without limitation" is unreasonable, would yield absurd results, and is contrary to MOPSA.

The PSC advised the parties in numerous orders of its obligation to bring the proceedings to a timely resolution. Working under strict time restraints, the PSC had a managerial responsibility to oversee approximately 100 petitions for intervention; organize a representative presentation of evidence; acquire input from the public, agencies, local governments, and consultants; and issue a written order disposing of the case. The PSC would be unable to carry out these duties if it were required to afford unbounded participation to every intervenor. "[I]ntervention is a useful tool, but [one] which must be used carefully[,] lest the manageable lawsuit become an unmanageable cowlick."[97] Upon de novo review, we find no error in the PSC's interpretation of its own regulations or its actions taken pursuant to the APA.

The intervenors failed to show that the hearing officer's decisions violated their due process or equal protection rights. The intervenors presented evidence and argument, cross-examination, and redirect; had the opportunity for rebuttal; and filed briefs. The hearing officer gave the intervenors

---

[96] 291 Neb. Admin. Code, ch. 1, § 016.05 (1992).

[97] *Wilderness Society v. Morton*, 463 F.2d 1261, 1263 (D.C. Cir. 1972) (Tamm, Circuit Judge, concurring).

opportunities to bring out the differences in their positions regarding the pipeline, but they failed to form questions that were not redundant. The hearing officer explained to the intervenors that they had "asked the same questions of virtually every witness." The hearing officer received no substantive offer of proof to justify modifying the conditions and therefore adhered to the prehearing order. The intervenors' cross-examination time was not restricted. The parties never reached their 1-hour time limit for cross-examination. Additionally, they failed to call a witness allotted to address the MAR. The PSC did not act contrary to its own regulations or impose procedural conditions beyond its authority under the APA and Nebraska's Model Rules of Agency Procedure, and its decisions did not injure the intervenors' substantive rights. This assignment of error is without merit.

## 5. MOPSA Evidence Not Hearsay

[19,20] The intervenors next argue that the PSC erred in receiving into evidence public comments, transcripts of public meetings, and the consultants' reports. The intervenors argue that by including these materials in the record, the PSC violated their due process rights, because the evidence was inadmissible hearsay. It is undisputed that the Nebraska Evidence Rules applied to the proceedings. The Nebraska Evidence Rules provide that hearsay is admissible when authorized by the statutes of the State of Nebraska.[98] The legislative branch has the right to prescribe the admissibility of certain categories of evidence, but it is solely a judicial function to determine the weight, if any, to be given such evidence.[99]

Section 57-1407(2) permits the PSC to hold public meetings for the purpose of receiving public input at locations near the route and requires the PSC to "make the public input part of the record." Section 57-1407(3) allows the PSC to request

[98] Neb. Rev. Stat. § 27-802 (Reissue 2016).

[99] See *State ex rel. Veskrna v. Steel*, 296 Neb. 581, 894 N.W.2d 788 (2017).

state agencies to file a report "regarding information within the respective agencies' area of expertise relating to the impact of the major oil pipeline." Neb. Rev. Stat. § 57-1412 (Cum. Supp. 2018) enables the PSC to retain consultants "to assist with reviewing applications under [MOPSA]."

[21] The PSC included in the record evidence from public meetings held in York, O'Neill, Norfolk, and Ralston; reports from agencies listed under § 57-1407(3); and reports from consultants. The landowners objected on hearsay grounds and moved for a "mistrial," which the hearing officer overruled. The hearing officer's decision was correct because, assuming that the evidence in question was hearsay, the evidence was admissible by operation of MOPSA and § 27-802. Even if the PSC erred by admitting this evidence, the intervenors made no showing that they were unfairly prejudiced by the admission of the evidence. In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.[100] This assignment of error lacks merit.

### 6. Remaining Arguments Not Properly Raised in MOPSA Proceeding

Lastly, the intervenors raise constitutional challenges to various statutes. We conclude that these arguments are improperly raised in a MOPSA proceeding before the PSC, because the intervenors' arguments do not relate to whether or not the PSC should grant an application for a major oil pipeline route.

[22-24] As stated above, the intervenors have the full rights of original parties in a case. However, our jurisprudence recognizes some practical limitations on the right to intervene. The intervenors can raise only issues that sustain or oppose the respective contentions of the original parties.[101] An intervenor

---

[100] *Reiber v. County of Gage, ante* p. 325, 928 N.W.2d 916 (2019).

[101] *Streck, Inc. v. Ryan Family, supra* note 81; *Wayne L. Ryan Revocable Trust v. Ryan, supra* note 81.

who is not an indispensable party cannot change the position of the original parties or change the nature and form of the action or the issues presented therein.[102] "'[I]t is fundamental that an intervenor takes the action as he finds it and cannot secure relief that is foreign or extraneous to the action.'"[103] In other words, an intervenor cannot widen the scope of the issues, broaden the scope or function of the proceedings, or raise questions which might be the subject of litigation but which are extraneous to the controlling question to be decided in the case.[104] Here, the intervenors improperly sought to alter the scope and nature of a MOPSA proceeding by raising challenges to the constitutionality of various statutes, in particular §§ 57-1101, 57-1401, 57-1403, 57-1407(2) and (3), and 57-1408.

The original parties in a MOPSA proceeding are the applicant and the PSC. The PSC is a party in a MOPSA proceeding, because the PSC acts as more than a neutral factfinding body; the PSC is in charge of serving the public interest[105] and has investigative responsibilities.[106] The original parties did not challenge the constitutionality of MOPSA's provisions, but instead conducted the proceedings in recognition of their statutory obligations.

The intervenors' challenge to § 57-1101 miscomprehends condemnation proceedings. A condemnation proceeding is an

---

[102] *Gilbert v. First National Bank*, 154 Neb. 404, 48 N.W.2d 401 (1951); *State ex rel. Nelson v. Butler*, 145 Neb. 638, 17 N.W.2d 683 (1945). See, *Chandler Co. v. Brandtjen, Inc.*, 296 U.S. 53, 56 S. Ct. 6, 80 L. Ed. 39 (1935); John P. Lenich, Nebraska Civil Procedure § 16:9 (2019).

[103] *Harleysville Ins. Group v. Omaha Gas Appliance Co.*, 278 Neb. 547, 552, 772 N.W.2d 88, 93 (2009), quoting *Arnold v. Arnold*, 214 Neb. 39, 332 N.W.2d 672 (1983).

[104] *Id.* See, *State ex rel. Nelson v. Butler, supra* note 102; *First Nat. Bank of Neligh v. Lancaster*, 54 Neb. 467, 74 N.W. 858 (1898).

[105] See, § 84-917(2)(a)(i); *Shaffer v. Nebraska Dept. of Health & Human Servs.*, 289 Neb. 740, 857 N.W.2d 313 (2014).

[106] See *In re Application of Metropolitan Util. Dist.*, 270 Neb. 494, 704 N.W.2d 237 (2005). See, also, e.g., §§ 57-1407(2) and (3) and 57-1412.

action brought by a condemning authority in the exercise of its power of eminent domain.[107] In other words, eminent domain is the right or power to take private property for a public use and condemnation is the procedure whereby this power is exercised.[108] In a condemnation action, some right in property must be taken or damaged to afford a basis for relief.[109] The determination of compensation to the owner of property condemned for public use, by ascertaining the value of property taken or damaged, is a judicial function.[110] MOPSA proceedings merely concern what route, if any, should be approved, and as such, concern antecedent issues. The intervenors' concerns regarding § 57-1101 are premature and would be more properly raised in subsequent condemnation proceedings. After reviewing the record, we find no plain error and no merit to any assignment of error.

V. CONCLUSION

In summary, the PSC is an elected body created by the Nebraska Constitution to serve the public interest. In § 57-1403 of MOPSA, the Legislature determined that "[t]he construction of major oil pipelines in Nebraska is in the public interest . . . ." The Legislature designated the PSC as the agency responsible for determining which pipeline route is in the public interest. After months of careful consideration, the PSC determined that the evidence showed that the MAR is in the public interest. Upon de novo review, we find there is sufficient evidence to support the PSC's determination that the MAR is in the public interest. The assignments of error are without merit.

Affirmed.

---

[107] See *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013).

[108] *Van Patten v. City of Omaha*, 167 Neb. 741, 94 N.W.2d 664 (1959).

[109] *Lockard v. Nebraska Pub. Power Dist.*, 249 Neb. 971, 546 N.W.2d 824 (1996).

[110] See *Webber v. City of Scottsbluff*, 155 Neb. 48, 50 N.W.2d 533 (1951).