Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/22/2023 09:06 AM CDT

- 168 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

In re Claims Against Banghart Properties.
Terri Fritz, grain program manager, Grain
Warehouse Department, Nebraska Public Service
Commission, appellee, v. Banghart Properties LLC,
also known as Fearless Grain Marketing Storage
and Arbitrage, also known as Fearless Grain
Marketing, also known as Fearless Grain,
Gettysburg, South Dakota, appellant.

___ N.W.2d ___

Filed August 15, 2023.    No. A-22-427.

1. **Public Service Commission: Appeal and Error.** Under Neb. Rev. Stat.
   § 75-136(2) (Reissue 2018), an appellate court reviews an order of the
   Public Service Commission de novo on the record. In a review de novo
   on the record, an appellate court reappraises the evidence as presented
   by the record and reaches its own independent conclusions concerning
   the matters at issue.
2. **Administrative Law: Appeal and Error.** When an appellate court
   makes a de novo review, it does not mean that the court ignores the
   findings of fact made by the agency and the fact that the agency saw and
   heard the witnesses who appeared at its hearing.
3. ____: ____. Where the evidence is in conflict, an appellate court will
   consider and may give weight to the fact that the agency hearing exam-
   iner observed the witnesses and accepted one version of the facts rather
   than another.
4. ____: ____. In assessing a penalty under Neb. Rev. Stat. § 75-156 (Cum.
   Supp. 2022), it is appropriate, even under a de novo standard of review,
   to adhere to the common practice among appellate courts to afford
   appropriate deference to the findings of the agency before which the
   record was created.

Appeal from the Public Service Commission. Affirmed.

- 169 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

Loel P. Brooks, of Brooks, Pansing Brooks, P.C., L.L.O., and Robert Konrad, of Konrad Law, P.L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and L. Jay Bartel for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## INTRODUCTION

Banghart Properties LLC appeals from the imposition of a $290,000 civil penalty by the Nebraska Public Service Commission (PSC)for numerous violations of Nebraska's Grain Dealer Act (the Act) under Neb. Rev. Stat. §§ 75-901 to 75-910 (Reissue 2018) and related PSC regulations. For the reasons stated herein, we affirm.

## STATEMENT OF FACTS

Banghart Properties is a limited liability company operating primarily in South Dakota and is engaged in the business of grain merchandising, brokering, and purchasing. Banghart Properties was also licensed as a grain buyer and dealer in Colorado and North Dakota and ultimately sought licensing in Nebraska to conduct business in this state.

In July 2021, Jan Banghart (Jan), the managing member and sole owner of Banghart Properties, contacted Terri Fritz, the grain program manager with the PSC's grain warehouse department, to inquire into whether Banghart Properties needed a grain dealer license to operate in Nebraska. Fritz informed Jan that a grain dealer license was required to conduct business in Nebraska and provided information on obtaining a Nebraska license. During the conversation, after Jan informed Fritz that Banghart Properties had previously conducted business in Nebraska acting as a broker, Fritz indicated that Banghart Properties needed to obtain a grain dealer license prior to conducting further business in the state. Jan assured Fritz that

Banghart Properties would not conduct further business in Nebraska until it obtained a grain dealer license.

On September 15, 2021, Fritz received an application for a grain dealer license from Banghart Properties that did not include any other business names. On October 4, after receipt of Banghart Properties' application, but prior to its approval, Fritz became aware of an advertisement that had been published in a Nebraska newspaper that indicated "Banghart Properties, d/b/a Fearless Grain Marketing" was buying commodities from Nebraska producers at set price ranges. Fritz subsequently contacted Jan, and during the conversation, Jan informed Fritz that the advertisement was published in error and reassured Fritz that Banghart Properties would not be purchasing grain until after the company was approved to conduct business in Nebraska.

Shortly thereafter, during another telephone conversation, Fritz asked Jan for copies of contracts that Banghart Properties had executed with Nebraska producers. Jan once again reassured Fritz that Banghart Properties was not conducting business in Nebraska. Fritz subsequently received a phone call from Banghart Properties' attorney who, after reassuring Fritz that the company was not doing business in Nebraska, stated that any contract that the company had with Nebraska producers would be provided to Fritz. Around the same time, Fritz received another phone call from Jan, who disclosed that Banghart Properties had been doing business in Nebraska and inquired whether Banghart Properties could pay money owed to Nebraska producers.

On October 12, 2021, as a followup from the phone conversations, Fritz sent a letter ordering Banghart Properties to cease any grain dealer operations until completion of the application for licensing and the grant of a grain dealer license. In the letter, Fritz requested copies of all contracts between Banghart Properties and Nebraska producers. In response, Banghart Properties' attorney provided copies of

the contracts and supporting documentation related to its Nebraska business operations.

After obtaining the contracts and accompanying documents from Banghart Properties, Fritz learned that Banghart Properties had entered into 12 contracts with Nebraska producers for the purchase and delivery of Nebraska grain despite not being licensed as a grain dealer in Nebraska. Additionally, Banghart Properties purchased grain from Nebraska producers on at least 50 occasions between September 16 and October 21, 2021, which was during the period of time that Jan continued to reassure Fritz that Banghart Properties was not conducting business in Nebraska. Upon her examination of the contracts, Fritz also learned that Banghart Properties failed to provide specific "Warning to Seller" language as required by the PSC and that the tickets, receipts, bills of lading, and other written communication from Banghart Properties' purchases were not prenumbered and maintained in numeric order as required by regulation.

On October 21, 2021, Fritz filed a departmental complaint against Banghart Properties alleging numerous violations of the Act and related PSC regulations. Specifically, the complaint alleged Banghart Properties violated the Act by (1) performing actions as a grain dealer without a license; (2) taking possession of grain without issuing written documentation to the seller that included the required "Warning to Seller" language that informed Nebraska producers of the right to recourse against the required grain dealer's security; and (3) failing to issue prenumbered receipts, contracts, bills of lading, or other written communications. As a result of the violations, Fritz requested the assessment of civil penalties against Banghart Properties in the amount of $870,000 for 87 separate violations of the Act.

In the answer to the complaint, Banghart Properties admitted entering into the 12 grain purchase contracts as described in the complaint, took delivery of some of the contracted

- 172 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

grain, and paid producers. However, Banghart Properties denied violating the Act or any PSC regulations.

An evidentiary hearing was held before the PSC in January 2022. Testimony was adduced from Fritz and Jan consistent with the facts as laid out above. The PSC entered its order on March 15, finding:

> The record clearly shows that [Banghart Properties] acted as a Grain Dealer on numerous occasions by buying grain from Nebraska producers for purposes of selling such grain without first being licensed as a Nebraska Grain Dealer. Moreover, [Banghart Properties] was not an end user of the grain so purchased. [Banghart Properties] also did not attempt to make such grain purchases through any licensed Nebraska grain dealers, electing to purchase directly from Nebraska producers.

> The Complaint identifies 29 separate grain purchases with respect to which [Banghart Properties] acted as an unlicensed grain dealer during the period of September 16, 2021, through October 7, 2021. [Banghart Properties] admitted to these purchases in its Answer. Documentation of these transactions is included in the hearing record. The existence of these transactions is not in dispute. Therefore, we find by clear and convincing evidence that [Banghart Properties] has committed 29 separate violations of the grain dealer licensure requirements of the . . . Act as alleged in the Complaint.

> Furthermore, we note that the record also includes documentation from [Banghart Properties'] own business records demonstrating that an additional 21 unlicensed grain purchases were made by [Banghart Properties] from four Nebraska producers between the dates of October 7, 2021, and October 21, 2021, that were not referenced in the Complaint. The existence of these transactions is also not in dispute. Therefore, we find by clear and convincing evidence that such purchases constitute an

- 173 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

additional 21 violations of the grain dealer licensure requirements of the . . . Act.

Moreover, the record clearly shows that with respect to each of the 29 transactions referenced in the Complaint, [Banghart Properties], upon taking possession of the grain, failed to issue a receipt, contract, bill of lading or other written communication to the seller which included the required warning to seller language to inform producers of their rights to recourse against the required grain dealer security. Therefore, we find by clear and convincing evidence that [Banghart Properties] has committed 29 violations of the transaction documentation requirements of the . . . Act.

Furthermore, the record clearly shows that with respect to each of the 29 transactions referenced in the Complaint, [Banghart Properties] failed to issue a pre-numbered grain dealer receipt as required by [PSC] regulation. Therefore, we find by clear and convincing evidence that [Banghart Properties] has committed a further 29 violations of the transaction documentation requirements of the . . . Act and [PSC] regulations.

After finding that Banghart Properties had committed violations of the Act and related PSC regulations, the PSC determined that "a substantial civil penalty" was warranted, but declined to award the grain department's requested penalty of $870,000, instead reducing the recommendation by two-thirds and imposing a civil penalty of $290,000. In its order, the PSC stated:

We agree with the grain department that the facts presented in this docket warrant a substantial civil penalty. However, we decline to fully adopt the department's recommendation that the [PSC] impose the maximum penalty for all violations of the Act identified in the Complaint. More specifically, although we agree that the documentation failures relating to the warning to seller language and pre-numbered documents are clear

- 174 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

violations of the Act, we also note that these documenta-
tion requirements are presumably directed at grain dealers
that have actually obtained proper licensing.

. . . .

Therefore, we reduce [the department's] recommenda-
tion by two-thirds and impose a civil penalty of $290,000.
We deem this amount to be an adequate penalty, taking
into account the 50 unlicensed grain purchases proven by
the record, which includes the 29 transactions referenced
in the Complaint plus the 21 additional unlicensed grain
purchases documented by [Banghart Properties'] busi-
ness records.

We also recognize that even this reduced amount con-
stitutes a civil penalty that is on a scale greater than other
penalties imposed by the [PSC] in other recent grain
dealer matters. Nonetheless, after a careful examination
of the testimony and the written record introduced at
the hearing, we think a civil penalty in the amount of
$290,000 is clearly warranted under the facts presented
in this docket.

In determining the amount of the penalty assessed, the
PSC considered multiple factors, including that an unlicensed
grain dealer presents a significant risk of financial harm to
Nebraska producers; that Banghart Properties operated as
a grain dealer in Nebraska for an extended period of time
without obtaining a license; that Jan, the owner of Banghart
Properties, had decades of experience in state regulation;
that Banghart Properties' application for licensure presented
an inaccurate picture of its Nebraska grain dealer business;
that Banghart Properties never filed a financial statement as
required under Nebraska law; that Banghart Properties did
not demonstrate that it met the minimum net worth require-
ment needed to qualify as a licensed grain dealer in Nebraska;
that Banghart Properties never obtained the required finan-
cial security to protect Nebraska producers as required by
Nebraska law; that Banghart Properties continued to operate

- 175 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

as an unlicensed grain dealer for several months, while at the same time Jan repeatedly assured the grain department that it was not doing so; that Banghart Properties failed to exercise effective control over the activities of company employees; and that the mitigating factors identified by Banghart Properties did not excuse the company's actions.

Following the entry of the PSC's order, Banghart Properties timely filed a motion for reconsideration that was denied by the PSC. Banghart Properties now appeals from the order finding that it violated the Act and corresponding regulations and assessing a civil penalty of $290,000.

## ASSIGNMENTS OF ERROR

Banghart Properties assigns that the PSC erred as a matter of law by (1) issuing an excessive and disproportionate civil penalty without giving proper consideration and weight to numerous mitigating factors and (2) directing Banghart Properties to rescind its grain contracts with producers and impermissibly using Banghart Properties' failure to do so as an aggravating factor in support of its excessive penalty.

## STANDARD OF REVIEW

[1-3] Under Neb. Rev. Stat. § 75-136(2) (Reissue 2018), an appellate court reviews an order of the PSC de novo on the record. *In re App. No. P-12.32 of Black Hills Neb. Gas*, 311 Neb. 813, 976 N.W.2d 152 (2022). In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue. *Id.* When an appellate court makes a de novo review, it does not mean that the court ignores the findings of fact made by the agency and the fact that the agency saw and heard the witnesses who appeared at its hearing. *Id.* Where the evidence is in conflict, an appellate court will consider and may give weight to the fact that the agency hearing examiner observed the witnesses and accepted one version of the facts rather than another. *Id.*

- 176 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

## ANALYSIS

### Civil Penalty

Banghart Properties first assigns that the PSC erred in assessing a civil penalty without properly considering the mitigating factors presented during the hearing. More specifically, Banghart Properties argues that the civil penalty imposed was excessive in light of the remedial and corrective actions taken by Banghart Properties, that the record showed there was no economic harm to any Nebraska producer, and that the penalty was drastic and disproportionate to all previous civil penalties imposed by the PSC in grain-related matters.

The Act and corresponding PSC regulations require all grain dealers doing business in Nebraska to procure and maintain a license from the PSC. See, § 75-903; 291 Neb. Admin. Code, ch. 8, § 003.01 (2018). To procure a license from the PSC, a grain dealer must: (1) pay an annual fee; (2) file security in the form of a bond, an irrevocable letter of credit or certificate of deposit for the benefit of any producer who files a valid claim arising from a sale to the grain dealer; and (3) file a reviewed and audited financial statement prepared by an independent certified public accounting firm. See § 75-903(1) through (3). It is undisputed that Banghart Properties is a "[g]rain dealer" as that term is defined in the Act. See § 75-902(5). In addition to licensing requirements, we quote from additional statutes and a corresponding regulation that were violated by Banghart Properties and relate to the PSC's imposition of a penalty here.

Pursuant to § 75-904:

Each grain dealer or his or her agent upon taking possession of grain from a seller shall issue a receipt, contract, bill of lading, or other written communication to the seller or his or her agent. The grain dealer receipt, contract, bill of lading, or other written communication issued by the grain dealer shall include the provisions of section 75-905 and be in such form as the [PSC] may by rule and regulation require.

- 177 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

And, pursuant to § 75-905:

(1) No seller shall have recourse to the grain dealer's security unless the seller:

(a) Demands payment from the grain dealer within fifteen days after the date of the last shipment of any contract;

(b) Negotiates any negotiable instrument issued as payment for grain by the grain dealer within fifteen days after its issuance; and

(c) Notifies the [PSC] within fifteen days after any apparent loss to be covered under the terms of the grain dealer's security.

(2) The grain dealer's security shall provide security for direct delivery grain until any post-direct delivery storage position is created for a period not to exceed fifteen days after the date of the last shipment of the contract.

Further, 291 Neb. Admin. Code, ch. 8, § 003.05A8 (2018) provides that "[a]ll receipts, contracts, bills of lading or other written communications shall be pre-numbered and copies shall be maintained in numeric order."

The Act provides that the PSC "may assess a civil penalty, pursuant to section 75-156, against any person who violates the . . . Act." § 75-910. Neb. Rev. Stat. § 75-156 (Cum. Supp. 2022) provides in relevant part:

(1) In addition to other penalties and relief provided by law, the [PSC] may, upon a finding that the violation is proven by clear and convincing evidence, assess a civil penalty of up to ten thousand dollars per day against any person, motor carrier, regulated motor carrier, common carrier, contract carrier, licensee, grain dealer, or grain warehouseman for each violation of (a) any provision of the laws of this state within the jurisdiction of the [PSC] as enumerated in section 75-109.01, (b) any term, condition, or limitation of any certificate, permit, license, or authority issued by the [PSC] pursuant to the laws of this state within the jurisdiction of the [PSC] as

- 178 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

enumerated in section 75-109.01, or (c) any rule, regulation, or order of the [PSC] issued under authority delegated to the [PSC] pursuant to the laws of this state within the jurisdiction of the [PSC] as enumerated in section 75-109.01.

. . . .

(5) The civil penalty assessed under this section shall not exceed two million dollars per year for each violation except as provided in subsection (4) of this section. The amount of the civil penalty assessed in each case shall be based on the severity of the violation charged. The [PSC] may compromise or mitigate any penalty prior to hearing if all parties agree. In determining the amount of the penalty, the [PSC] shall consider the appropriateness of the penalty in light of the gravity of the violation and the good faith of the violator in attempting to achieve compliance after notification of the violation is given.

Applying the criteria set forth in § 75-156(5), the PSC determined that Banghart Properties should be fined $290,000. Banghart Properties assigns that the penalty is excessive. As an initial matter, the parties appear unclear on our standard of review governing this determination. Both parties cite to the Nebraska Supreme Court's decisions in *Telrite Corp. v. Nebraska Pub. Serv. Comm.*, 288 Neb. 866, 852 N.W.2d 910 (2014), which was abrogated as stated in *In re Application No. OP-0003*, 303 Neb. 872, 932 N.W.2d 653 (2019), as providing governance on the subject. In *Telrite Corp.*, the Nebraska Supreme Court examined the court's standard of review in connection with the PSC's order revoking the corporation's eligible telecommunications carrier status with the PSC. In doing so, the Nebraska Supreme Court held:

As an initial matter, the parties disagree whether we should defer to the PSC's penalty determination. Telrite asserts that, because § 75-136 authorizes de novo review, we do not owe any deference to the PSC's determination. The PSC maintains that our previous decisions

- 179 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

require us to affirm the sanction ordered by the PSC absent "'arbitrar[iness]' or an 'abuse of discretion.'" In those cases, we stated that determinations by the PSC are a matter peculiarly within its expertise and involve a breadth of judgment and policy determination that an appellate court should not disturb in the absence of a showing that the PSC's action was arbitrary or unreasonable. But we made these statements before 2013, when the Legislature amended § 75-136 to provide a "de novo on the record" standard of review. Before 2013, a party appealed from the PSC under the Administrative Procedure Act and an appellate court reviewed the PSC's order for errors appearing on the record. Under this standard of review, our inquiry was limited to whether the decision conformed to the law, was supported by competent evidence, and was neither arbitrary, capricious, nor unreasonable. Our review of pre-2013 cases shows that the deference accorded to the PSC was tied to the deferential standard of review applied by an appellate court under the Administrative Procedure Act. We therefore reject the PSC's contention that it is due the same degree of deference it enjoyed before the Legislature amended § 75-136. Under the amended § 75-136, an appellate court must reappraise the evidence on the record as it relates to the penalty issued by the PSC and reach an independent conclusion.

*Telrite Corp. v. Nebraska Pub. Serv. Comm.*, 288 Neb. at 874-75, 852 N.W.2d at 915-16. Notably, the court did not reach the issue of the proper standard of review in connection with a penalty determination under § 75-156 because, as the court noted:

We need not express an opinion regarding the appropriateness of lesser sanctions. The NTUSFA [Nebraska Telecommunications Universal Service Fund Act] provides that the PSC has the power to withhold funds if a telecommunications company fails to comply with the

- 180 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

PSC's orders or regulations and, under Neb. Rev. Stat. § 75-156 (Supp. 2013), administratively fine any person who violates the NTUSFA. We note in passing that non-compliance with the PSC's orders violates the NTUSFA and may subject a telecommunications provider to fines under § 75-156. But the only order in the record that Telrite violated was the May 29, 2013, order, which stated that Telrite must use a Nebraska-specific form. Under § 75-156(1), the PSC has the discretion to issue fines of up to $10,000 per day if it finds, by clear and convincing evidence, that "any term, condition, or limitation of any certificate, permit, or authority issued by the [PSC]" or "any rule, regulation, or order of the [PSC]" was violated. Should the PSC consider the imposition of an administrative fine on remand, § 75-156(5) directs it to consider the gravity of Telrite's violation and its good faith efforts to achieve compliance after being notified of the violation. And, of course, Telrite's conduct at the Omaha event may be considered should future compliance problems occur.

*Telrite Corp. v. Nebraska Pub. Serv. Comm.*, 288 Neb. at 877, 852 N.W.2d at 917.

But in *In re Application No. OP-0003*, 303 Neb. 872, 901-03, 932 N.W.2d 653, 675-76 (2019), the Nebraska Supreme Court revisited the issue of the standard of review in connection with certain PSC determinations and provided as follows:

The PSC is an independent regulatory body created by the Nebraska Constitution in article IV, § 20. The powers and duties of the PSC include the "general control of common carriers as the Legislature may provide by law." The constitutional provision creating the PSC must be liberally construed to effectuate the purpose for which the PSC was created, which is to serve the public interest. In the absence of specific legislation, the powers and duties of the PSC, as enumerated in the constitution, are absolute and unqualified.

- 181 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

We have repeatedly said that the determination of what is consistent with the public interest, or public convenience and necessity, is one that is peculiarly for the determination of the PSC. "'[C]ourts must give substantial deference to [the PSC's] judgment about how best to serve the public interest.'" We have made this statement in recognition of the PSC's status as a constitutional entity, and we have gone as far as to state that the "Supreme Court does not act as an appellate [PSC]." However, in 2013, the Legislature amended § 75-136(2) to change our standard of review from errors appearing on the record, as provided under the APA, to "de novo on the record."

We first addressed the "de novo on the record" standard of review for PSC cases in *Telrite Corp. v. Nebraska Pub. Serv. Comm*. Prior to the amendment, a party appealed from the PSC under the APA, and the initial appeal was taken to district court, which conducted a de novo review on the record of the agency. Our inquiry in appeals from a district court's decision under the APA is limited to whether the decision conformed to the law, was supported by competent evidence, and was neither arbitrary, capricious, nor unreasonable. In *Telrite Corp.*, we rejected the PSC's argument that the previous, more deferential standard of review for an appellate court under the APA still applied after the amendment to § 75-136. In so finding, we stated that the PSC was not "due the same degree of deference it enjoyed" before the amendment.

However, the issue of what deference is owed to the PSC regarding its public interest determinations is more nuanced than stated in *Telrite Corp.* Under [the Major Oil Pipeline Siting Act], the PSC views the witnesses and evaluates the strength of their testimony, receives comments from the public, investigates the issues presented in coordination with state agencies and

- 182 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

authorized consultants, evaluates the public interest, and makes the initial decision of whether to approve an application and authorize eminent domain power. Under the circumstances, it is appropriate, even under a de novo standard of review, to adhere to the common practice among appellate courts to afford appropriate deference to the findings of the agency before which the record was created. We articulate this standard in light of the PSC's being constitutionally created to serve the public interest.

Thus, the question becomes, what is the proper standard of review in connection with a PSC penalty determination under § 75-156? Again, although we are governed by the statutory de novo standard of review set forth in § 75-136, we recognize that the language of § 75-156(1) vests the PSC with discretionary authority to issue fines up to $10,000 per day if it finds by clear and convincing evidence that "'any term, condition, or limitation of any certificate, permit, or authority issued by the [PSC]' or 'any rule, regulation, or order of the [PSC]' was violated." *Telrite Corp. v. Nebraska Pub. Serv. Comm.*, 288 Neb. 866, 877, 852 N.W.2d 910, 917 (2014). See *In re Application No. OP-0003*, 303 Neb. 872, 932 N.W.2d 653 (2019).

[4] We view the exercise of that authority as a determination of what is consistent with the public interest, or public convenience and necessity, and one that is peculiarly for the determination of the PSC. See *In re Application No. OP-0003, supra*. As such, we believe that the exercise of this discretionary authority as being more aligned with the more nuanced standard of review set forth in *In re Application No. OP-0003*. That is, in assessing a penalty under § 75-156, we find it appropriate, even under a de novo standard of review, to adhere to the common practice among appellate courts to afford appropriate deference to the findings of the agency before which the record was created.

In this case, Banghart Properties does not dispute that it violated the above-quoted provisions of the Act and the

corresponding regulations in multiple ways. Instead, it simply argues that the facts of this case should not result in such an egregious financial penalty and that multiple mitigating factors supported a lesser one. Conversely, the PSC, in its order, specifically stated that the mitigating factors presented by Banghart Properties did not excuse the company's actions and did warrant such a penalty.

Based upon our de novo review of the record, but affording appropriate deference to the agency before which the record was created, we find that the PSC did not err in assessing a civil penalty in the amount of $290,000 for the multitude of violations of the Act and the corresponding regulations by Banghart Properties. We are persuaded that the mostly undisputed facts in this record demonstrate a case of serious misconduct with relatively minimal efforts at mitigation in light of the nature of the misconduct.

In reaching that conclusion, we are governed by the penalty assessment criteria set forth in § 75-156(5), which criteria require that we consider the severity of the violation charged, the appropriateness of the penalty in light of the gravity of the violation, and the good faith efforts to mitigate the violation after notification of the violation. The record demonstrates that Jan had extensive experience in regulatory compliance prior to commencing business as Banghart Properties, yet she began operating extensively as a grain dealer in Nebraska without pursuing a license to conduct business here. To that end, before pursuing required licensing in this state, Banghart Properties entered into 12 separate contracts with Nebraska producers to purchase extensive quantities of grain throughout the state. Once Jan, the company's sole owner, inquired on July 19, 2021, about the requirement for licensure and learned she needed one, she represented to Fritz that although her company had commenced doing business here, the company would not do further business in Nebraska until it obtained a license. Notwithstanding Jan's discovery of a licensure requirement on July 19, Banghart

- 184 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

Properties delayed submitting an application until September 15, and notwithstanding Jan's numerous representations to the contrary, Banghart Properties engaged in 50 separate purchasing transactions between September 16 and October 21, prior to obtaining a license to transact business in this state. Twenty-one of these transactions occurred after Fritz filed a complaint on behalf of the department that alleged 29 such unauthorized transactions.

As to all of these unauthorized transactions, Banghart Properties failed to comply with the security disclosure requirements of the Act and the document maintenance requirements of the corresponding regulations. And all of this was uncovered by Fritz following her discovery of an advertisement in a Nebraska newspaper placed after Jan explicitly represented that her company would not conduct further business in Nebraska until Banghart Properties was properly licensed. Additionally, despite Jan's representations, and following the filing of the complaint by Fritz, Banghart Properties executed two new contracts with Nebraska grain producers in November 2021 while the application was pending. And despite at least four inquiries from Nebraska producers to Fritz about security concerns due to Banghart Properties' violations, according to Fritz, Banghart Properties discouraged one such party from voiding its contract and refused to notify its other contracting parties of Banghart Properties' unlicensed status so that those parties could pursue their contract rights.

In connection with Banghart Properties' eventual submission of an application, the application itself contained statements that were inconsistent with, and contradicted by, its previous unlicensed contractual activity; did not contain the required financial statements required by the Act so as to demonstrate the financial strength of the company; and did not provide the PSC with sufficient evidence of financial security required to protect Nebraska producers under Nebraska law, despite the company's having purchased grain from Nebraska producers on over 50 occasions.

- 185 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

While Banghart Properties does not contest that it violated the Act and regulations, it argues that the penalty is too harsh given the attempts to mitigate and that the penalty is vastly disproportionate to prior fines levied by the PSC. In furtherance of this argument, Banghart Properties argues that Jan was unaware of an employee's placing of the advertisement in a Nebraska newspaper or entering into new contracts in November 2021 while the application was being pursued. Banghart Properties argues that these employees were properly disciplined and that new policies were drafted internally to ensure compliance with rules. Banghart Properties argues that Jan initiated cancellation of the November contracts, left the decision on cancellation of other contracts to the contracting producers, and by the conclusion of the hearing, had canceled all contracts requested to be canceled by any such requesting producers. Banghart Properties further argues that no Nebraska producer incurred actual harm here.

Although we agree that it does not appear on this record that any actual harm befell any specific Nebraska grain producer, we disagree that the actual mitigation pursued here warranted a lesser fine from that which was assessed by the PSC. In assessing the nature of the mitigation pursued here, the PSC found:

[Banghart Properties] has asserted that there are mitigating factors in the record which should reduce any civil penalty to a "minimal" amount. According to [Banghart Properties'] counsel, such mitigating factors include, the partial completion of the Nebraska license process, the existence of a South Dakota bond, the suspension of an employee who solicited Nebraska business in November 2021, the development of new operational policies incorporating Nebraska rules, and discussions with Nebraska producers. In short, "new policies, new procedures, new rules, more oversight, more time in the office."

We have considered these alleged mitigating factors, but we do not agree they should result in a further

- 186 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

reduction of the civil penalty. To begin with, these so-called mitigating factors apparently did nothing to interfere with [Banghart Properties'] activities as an unlicensed grain dealer. The record shows that Banghart Properties employees signed Nebraska producers to grain purchase contracts as late as November 5, 2021, and the company's business records show grain purchases from Nebraska producers as late as October 22, 2021. In addition, both the employee suspension and the adoption of the new operational policies did not occur until November 15, 2021. Therefore, those items are not so much mitigating factors as subsequent remedial measures, undertaken after the Complaint was filed.

Effective mitigation would have been to offer producers the opportunity to cancel their purchase agreements after disclosing to them the lack of licensing and the lack of financial security that is required by the . . . Act. Effective mitigation would have been to diligently pursue the required license in the weeks and months after finally realizing it was required, and not purchasing grain until after the license was obtained. Effective mitigation might also have been for [Jan] to stop soliciting producers grain dealer business in Nebraska, until all required steps to obtaining a license were complete and properly licensing was obtained. However, this sort of mitigation did not occur.

We agree. Although Banghart Properties pursued some subsequent remedial measures as described above, those measures did not adequately address the series of unauthorized transactions Banghart Properties pursued with grain producers in Nebraska despite Jan's representations to the contrary. And although the PSC ordered Banghart Properties to contact its multiple contracting parties to advise them of Banghart Properties' unlicensed status in Nebraska so that they could pursue any potential contract remedies available to them, Banghart Properties refused to do so while positing that it

- 187 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

would rescind contracts only with those parties that contacted the company directly. In short, Banghart Properties appears to have attempted to tread a fine line between demonstrating the appearance of mitigation while avoiding the loss of revenue from contracts it improperly entered into before being granted a license. And as we explain more fully in connection with our analysis of Banghart Properties' second assignment of error, Banghart Properties' contracts with these parties who were financially exposed by its lack of regulatory compliance were either void or voidable due to its unlicensed status when it obtained them, and Banghart Properties' refusal to apprise the producers in this state with whom it unlawfully contracted of that status amounted to ineffective mitigation in relation to the degree of noncompliance on this record.

The record indicates 50 separate transactions by Banghart Properties constituting violations of § 75-903, all of which occurred after Jan was made aware of the statutory requirements, and 21 of which occurred after Fritz' October 21, 2021, filing of the complaint. At least 29 of these purchases did not comply with the notification requirements of § 75-904 or the documentary requirements of 291 Neb. Admin. Code, ch. 8, § 003.05A8. Although § 75-156(1) authorizes the PSC to assess a civil penalty of up to $10,000 for each violation, and although the department recommended the maximum penalty on each violation, the PSC did not fine Banghart Properties for each of the 87 violations. Rather, the PSC assessed the maximum fine for the 29 transactions originally charged in the complaint, which were entered into after Banghart Properties was aware of the licensure requirements, despite Jan's representations that the company would not conduct business until after obtaining such licensure. These actions were accompanied by Banghart Properties' unwillingness to notify Nebraska grain producers of Banghart Properties' status in connection with these contracts and the grain producers' attendant risk associated therewith. Although none of the Nebraska grain producers appear to have incurred actual harm, applying the

- 188 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

criteria set forth in § 75-156(5), we cannot say that it was an error in the penalty assessed for these multiple violations under these facts or that it somehow is too disparate from other incidents or violations so as to require reversal. This first assignment of error fails.

## Direction to Rescind

Banghart Properties next assigns and argues that the PSC erred as a matter of law when it directed Banghart Properties to rescind its grain contracts with Nebraska producers and then used its failure to do so as an aggravating factor in support of an excessive penalty. Although Banghart Properties frames this issue as a direction by the PSC for Banghart Properties to rescind its contracts, we disagree with that characterization.

The specific directive by the PSC was set forth in its order and provided:

> IT IS FURTHER ORDERED that Banghart Properties, . . . must contact any Nebraska producers that are currently under contract with Banghart Properties, . . . inform such producers that Banghart Properties . . . is not licensed as a Grain Dealer in the State of Nebraska and provide such producers the opportunity to cancel their contracts.

When assessing Banghart Properties' refusal to comply with this order, the PSC stated:

> Effective mitigation would have been to offer producers the opportunity to cancel their purchase agreements after disclosing to them the lack of licensing and the lack of financial security that is required by the . . . Act. Effective mitigation would have been to diligently pursue the required license in the weeks and months after finally realizing it was required, and not purchasing grain until after the license was obtained. Effective mitigation might also have been for [Jan] to stop soliciting producers grain dealer business in Nebraska, until all required steps to obtaining a license were complete and properly licensing was obtained. However, this sort of mitigation did not occur.

- 189 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

As such, the PSC did not direct Banghart Properties to rescind these contracts but ordered Banghart Properties to inform its contracting parties that Banghart Properties lacked a license to do business in Nebraska when entering those contracts so that the contracting parties could pursue legal rights available to them. The parties then disagree over what those legal rights are. Banghart Properties argues that the failure to procure a license made the contracts voidable by the contracting producers while the PSC argues that the contracts were void. Whether these contracts are void or voidable is a matter we need not decide.

Both parties acknowledge that Banghart Properties' failure to obtain a license when contracting within Nebraska provided the contracting parties with legal rights related to those contracts, and the PSC directed Banghart Properties to inform the parties of their contract status in light of their risk attendant with Banghart Properties' failure to comply with the Act and the corresponding regulations. Banghart Properties refused to follow this directive, agreeing only to allow contracting producers that contacted the company to rescind their contracts. Rather than penalizing Banghart Properties for failing to rescind its grain contracts, the PSC considered Banghart Properties' refusal to inform those producers of their contract status in connection with Banghart Properties' claim that it adequately mitigated the damage caused by the company's noncompliance. We reject Banghart Properties' specific assignment of error that the PSC had no authority to direct Banghart Properties to rescind its contracts, as that is inconsistent with the specific language contained in the PSC's order. We find that in assessing its penalty, the PSC did not err in considering whether Banghart Properties' refusal to inform all Nebraska contracting producers of the status of their contracts was adequate mitigation. And, as we noted above, we find this failure significant as it relates to an appropriate penalty to assess in connection with Banghart Properties' multiple violations on this record. This assignment of error fails.

- 190 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE CLAIMS AGAINST BANGHART PROPERTIES
Cite as 32 Neb. App. 168

## CONCLUSION

As stated above, we find that the civil penalty was not excessive and that the PSC did not err in considering the alleged mitigating factors and Banghart Properties' failure to inform the contracting parties of the status of their contracts as an aggravating factor in assessing a penalty. The PSC's order is affirmed.

AFFIRMED.